LAW OFFICES OF

**WALKUP, MELODIA, KELLY & SCHOENBERGER**
A PROFESSIONAL CORPORATION

650 CALIFORNIA STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94108-2615
T: (415) 981-7210 · F: (415) 391-6965

KHALDOUN A. BAGHDADI (State Bar #190111)
kbaghdadi@walkuplawoffice.com
SARA M. PETERS (State Bar #260610)
speters@walkuplawoffice.com
JADE SMITH-WILLIAMS (State Bar #318915)
jsmithwilliams@walkuplawoffice.com

WENDI J. BERKOWITZ (State Bar #145624)
MESSING ADAM & JASMINE LLP
235 Montgomery Street, Suite 828
San Francisco, CA 94104
Telephone: (415) 266-1800
Facsimile: (415) 266-1128
wendi@majlabor.com

**ATTORNEYS FOR PLAINTIFFS**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| KEVIN ABBEY, et al. | Case No. 3:19-CV-07510-JD |
| Plaintiffs, | **FIRST AMENDED COMPLAINT FOR DAMAGES** |
| v. | **[Negligent Undertaking, Negligent Misrepresentation; Public Nuisance; RICO; Loss of Consortium; Wrongful Death; Negligent Infliction of Emotional Distress; Intentional Infliction of Emotional Distress; Amount in Controversy Exceeds $25,000]** |
| TETRA TECH EC, INC.; TETRA TECH EM, INC.; and TETRA TECH, INC. | |
| Defendants. | |
| | **DEMAND FOR JURY TRIAL** |

Plaintiffs, by and through undersigned counsel Walkup, Melodia, Kelly &

Schoenberger, a Professional Corporation, and Messing Adam & Jasmine LLP, as

their Complaint against Defendants Tetra Tech EC, Inc. Tetra Tech EM, Inc., and

Tetra Tech, Inc. (hereafter, collectively, "Tetra Tech") hereby allege as follows:

**INTRODUCTION**

1.      This case is brought on behalf of the men and women who serve and protect the citizens of and visitors to San Francisco, California. As discussed more fully herein, due to Defendants' negligent acts and criminal cover-up, the officers of the San Francisco Police Department (SFPD) were exposed, at Hunters Point Naval Shipyard, to unsafe levels of radioactive and otherwise hazardous substances. Defendants' failure to disclose the truth about the hazardous substances present at the base, and Defendants' subsequent failure to follow proper decontamination procedures, and decision to conceal information about their failure from the City and County of San Francisco (the City) in violation of federal law, was a substantial factor in causing the Plaintiffs' acute symptoms and elevated risk of developing life-threatening cancers and other diseases.

2.      From the mid-1800s to about 1989, Hunters Point Naval Shipyard (HPNS) in San Francisco was used by private entities and the U.S. Navy for ship maintenance and repair activities.

3.      Over the decades, these ship maintenance and repair activities caused the release of waste oils, cleaning solvents, sandblasting materials, acid, and other hazardous substances throughout the HPNS base.

4.      From about 1946 to 1969, the Navy used HPNS as the site of extensive radioactive research, testing, and cleanup, resulting in widespread radioactive contamination of the entire HPNS base.

5.      In particular, from 1946 to 1955, during a period when there was no regulation of its radioactive facilities, the Navy operated a radioactive laundry on the property that would later be the site of Building 606 (the "Building 606 Property" is defined in paragraph 84), releasing hazardous radionuclides into the soil and groundwater there.

6.      In the 1980s, pipes carrying waste oil contaminated with polychlorinated biphenyls (PCBs) broke and spilled PCBs into the Building 606

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

2

FIRST AMENDED COMPLAINT FOR DAMAGES - CASE NO. 3:19-CV-07510-JD

1   Property.

2       7.     During or prior to the construction of Building 606, the Navy excavated

3   contaminated soil from under Building 606. Instead of properly containing and safely

4   disposing of the soil so as not to further release or spread any contamination, the

5   Navy lay the excavated soil on the surface of the ground surrounding Building 606.

6       8.     In light of the extensive history of hazardous substances being used,

7   stored, and released at HPNS, the United States Environmental Protection Agency

8   (US EPA) found, in 1989, that HPNS met the criteria under the Comprehensive

9   Environmental Response, Compensation, and Liability Act (CERCLA) for inclusion

10   on the list of US EPA-regulated "Superfund" sites. As such, the Navy would have to

11   comprehensively evaluate and remediate HPNS, under US EPA supervision, before

12   the base could be reused.

13       9.     Between 1989 and 1996, although the Navy had not yet performed any

14   comprehensive evaluation or remediation, it entered into discussions with the City

15   about a potential short-term lease of the Building 606 Property to the City for use by

16   the SFPD.

17       10.    Between 1989 and 1996, the Navy contracted with Tetra Tech (including

18   with predecessor corporation PRC Environmental Management, Inc. and then

19   successor corporation Tetra Tech EM, Inc.) to perform studies and review Navy

20   records for the express purpose of (1) determining whether the Building 606 Property

21   could be safely leased to the City of San Francisco (the City) for use by the SFPD and

22   (2) complying with the statutory requirement that the Navy notify the City of the full

23   history of hazardous substances that had been used or released at the Building 606

24   Property.

25       11.    Despite the existence of Navy records stating that a radioactive laundry

26   had operated on the Building 606 Property, Tetra Tech negligently told the Navy and

27   City that there was no history of any radioactive substances at the Building 606

28   Property.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

3

FIRST AMENDED COMPLAINT FOR DAMAGES - CASE NO. 3:19-CV-07510-JD

12.     Despite the fact that the extent of persistent contamination and human health risk at HPNS remained unknown, and was subject to ongoing and future testing, Tetra Tech told the Navy and City that the SFPD could use the Building 606 Property without exposing SFPD employees to health risk from exposure to hazardous substances.

13.     In connection with the lease of the Building 606 Property, the Navy and Tetra Tech provided the City with a Finding of Suitability to Lease and property-specific environmental baseline survey that included numerous material misrepresentations regarding the release of hazardous substances at and around the Building 606 Property, including but not limited to the following false statements:

a.     "[T]here are no known health risks associated with the use of Building 606 for office administration and staging by the SFPD."

b.     Former Building 503, which had been on the site of the Building 606 Property, "did not have uses consistent with the storage or use of hazardous materials."

c.     HPA (the Hunters Point Annex) had been used for only "limited radiological operations."

d.     As part of the disestablishment of the NRDL (Naval Defense Radiological Laboratory) "all sites were surveyed for radiological contamination and decontaminated if necessary. No radiological hazards are expected."

14.     These statements were not only false, but were clearly and unambiguously false based on a review of then-existing Navy records.

15.     Relying on these representations, the SFPD relocated hundreds of its police employees to begin working at HPNS in 1997.

16.     Plaintiffs in this action are former and active SFPD employees (most of whom were members of specialized police units including the SWAT team, bomb squad, tactical unit, K9 unit, dirt bike unit, crime lab, property control, and crowd control divisions) who worked at HPNS, as well as those Plaintiffs' spouses and

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

4

FIRST AMENDED COMPLAINT FOR DAMAGES - CASE NO. 3:19-CV-07510-JD

1    domestic partners.

2        17.    From 1992 until at least 2014 (including all the times when Plaintiffs

3    were working at HPNS), Tetra Tech (including Tetra Tech EC, Inc., its predecessors,

4    and Tetra Tech, Inc.) was required by the Navy contract to plan, oversee, and

5    perform extensive testing and remediation throughout HPNS.

6        18.    Pursuant to Navy contract, Tetra Tech was required to move through

7    the base, parcel by parcel, performing sampling and testing of soil to determine

8    whether suspected hazardous substances were present in levels above the cleanup

9    goals set by the Navy in conjunction with the US EPA and other agencies. When

10   Tetra Tech found elevated levels of hazardous substances, it was required to perform

11   additional sampling and testing until it found soil that tested clean, thus

12   demarcating the boundaries of the contaminated areas.

13       19.    Pursuant to Navy contract, Tetra Tech was required to safely contain

14   and dispose of any contaminated soil it processed. Depending on the type and extent

15   of contamination in each soil unit, processing requirements varied. Radioactive soil

16   was to be sealed in steel drums and processed in a specialized manner. Non-

17   radioactive soil that contained industrial chemicals was to be loaded into trucks,

18   driven through portal monitors to screen it for radioactivity before exiting the base,

19   and then taken to off-site landfills. Clean soil could be reused on site as backfill, with

20   minimal processing.

21       20.    Pursuant to Navy contract, Tetra Tech was responsible for ensuring the

22   testing and remediation activities at HPNS did not cause injury to Plaintiffs who

23   were working there.

24       21.    From 1992-2014, while Tetra Tech was performing testing and

25   remediation at HPNS, it was under increasing pressure to reduce the time and

26   expense of the project. The Navy's contracts with Tetra Tech provided financial

27   incentives for performing work quickly and efficiently. Some of the contracts had

28   budget caps built in, and others were fixed price, requiring Tetra Tech to bear the

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

5

FIRST AMENDED COMPLAINT FOR DAMAGES - CASE NO. 3:19-CV-07510-JD

expense if its test results showed more contamination than expected. Initial estimates regarding the scope, duration, and expense of the HPNS remediation proved to be inaccurate. Whereas the Navy originally anticipated that it would be able to fully remediate HPNS, and then sell it to the City, within a handful of years, the remediation work has now been ongoing for 28 years.

22. In an effort to save time and cost, from 1997 to 2014, Tetra Tech fraudulently performed its testing and remediation work. Its fraud included swapping out contaminated samples for clean samples, running scanning belts at high speeds, watering down soil to block detection of radioactivity, destroying test results at its on-site laboratory, and reducing the sensitivity of its test instruments. Tetra Tech's fraudulent activity resulted in two criminal convictions of Tetra Tech employees, as well as a False Claims Act lawsuit brought by the Navy, and former Tetra Tech employees (the whistleblowers or relators) against Tetra Tech.

23. By virtue of its fraudulent testing, from 1997 to 2014, Tetra Tech concealed from the Navy, the City, and Plaintiffs the actual extent of contamination that it knew or suspected was present throughout HPNS. It understated the human risk at HPNS, and failed to warn the City of the risk to its employees who were working at HPNS.

24. As a result of Tetra Tech's misrepresentations and concealment, the City continued to have Plaintiffs work at HPNS during Tetra Tech's remediation activities.

25. In addition, as a result of its own fraudulent testing and fraudulent reporting, Tetra Tech processed soil and materials that it knew or suspected were contaminated and potentially injurious to humans, handling such soil and materials as if they were clean, without taking safety precautions to protect the lives and safety of Plaintiffs who were working at HPNS. Tetra Tech dangerously:

a. Created Radiation Screening Yards (RSYs) on the land directly surrounding the Building 606 Property, where Plaintiffs were working,

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

6

FIRST AMENDED COMPLAINT FOR DAMAGES - CASE NO. 3:19-CV-07510-JD

b.      Routed its trucks so that they used the roadways bordering the Building 606 Property to carry contaminated soil to and from the RSYs,

c.      Failed to secure the truckloads of soil, so that soil dropped on the roadways shared with Plaintiffs and/or contaminants in the soil became airborne along the roadways,

d.      Dumped soil in unsecured piles surrounding the Building 606 Property,

e.      Created extensive soil disruption in the area of the Building 606 Property, which forced Plaintiffs to inhale contaminated airborne particulate matter (dust), and substantially increased Plaintiffs' exposure.

26.      As a result of Defendants' negligent and reckless acts and omissions as described herein, Plaintiffs were exposed, via numerous exposure pathways, to multiple hazardous substances at HPNS.

27.      Plaintiffs' exposure to hazardous substances at HPNS was a substantial factor in causing Plaintiffs' acute symptoms, including rashes, wheezing, coughing, shortness of breath, and headaches. It was also a substantial factor in causing Plaintiffs' a heightened risk of developing cancer, lung disease, and other adverse medical conditions in the future. For some Plaintiffs, who have already been diagnosed with cancer, lung disease, and other medical conditions, the exposure to hazardous substances at HPNS was likely a substantial factor in causing these diseases.

28.      By virtue of Tetra Tech's fraudulent testing, and its intentional destruction of test results and samples, Tetra Tech destroyed evidence of the actual and full extent of contamination at HPNS. It also shipped hazardous materials off-site, and/or relocated them within the base, such that the full extent of contamination may now never be knowable. As a result of Tetra Tech's spoliation of evidence, the full extent of Plaintiffs' exposure is still unknown and likewise may never be knowable, and this is a source of ongoing distress to Plaintiffs.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

7

FIRST AMENDED COMPLAINT FOR DAMAGES - CASE NO. 3:19-CV-07510-JD

1

## CLASS ACTION ALLEGATIONS

2    29.    In addition to, and in the alternative to, commencing this action in their

3  individual capacities, Plaintiff Abbey brings this action pursuant to Federal Rule of

4  Civil Procedure 23 on behalf of himself and all others similarly situated, as members

5  of the proposed Plaintiff class defined as follows:

6           All persons employed by the SFPD who, as a result of the
            Navy's 1996 leases of HPNS property to the SFPD, worked
7           at HPNS at any time from 1996 to the present.

8    30.    Plaintiffs reserve the right to amend the Class definition if discovery

9  and further investigation reveal that the Class should be expanded or otherwise

10  modified.

11          a.    **Numerosity:** Although the exact number of Class members is

12  uncertain and can only be ascertained through discovery, the Class is so numerous

13  that their individual joinder in this case is impracticable. The disposition of the

14  Class's claims in a single action will provide substantial benefits to all parties and to

15  the Court. Upon information, belief, and reasonable research, not less than

16  thousands of individuals have suffered losses, injuries, and damages due to

17  Defendant Tetra Tech's legal fault as alleged herein. Moreover, Class members are

18  readily ascertainable from information and records kept by the State of California

19  and the San Francisco Police Department. Class members may be notified of the

20  pendency of this action by mail and/or electronic mail, supplemented (if deemed

21  necessary or appropriate by the Court) by published notice.

22          b.    **Commonality:** Common questions of law and fact exist as to

23  Plaintiffs and all other Class members and predominate over questions affecting only

24  individual Class members. These questions, which arise from Defendants' common

25  course of conduct, include what Defendants knew and have known, and did and

26  failed to do, about the risk of Plaintiffs' exposure to carcinogens, whether Defendants

27  misled the City, SFPD, regulators, and members of the public; and whether

28  Defendants tried to cover up the existence and severity of their failures as alleged

LAW OFFICES OF
**WALKUP, MELODIA, KELLY
& SCHOENBERGER**
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

8

FIRST AMENDED COMPLAINT FOR DAMAGES - CASE NO. 3:19-CV-07510-JD

1    herein. Among these questions of law and fact are:

2                    i.      Whether Defendants' acts and omissions were a

3    legal/proximate cause of Plaintiffs' injuries;

4                    ii.     Whether Defendants' conduct constitutes violation of the

5    laws asserted herein;

6            c.      **Typicality:** Plaintiff Abbey's claims are typical of the other Class

7    members' claims and arise from Defendants' uniform course of conduct with respect

8    to misrepresenting the risk of carcinogenic and other toxic exposures as alleged

9    herein. The relief Plaintiff Abbey seeks individually is typical of the relief sought for

10   the other Class members.

11           d.      **Adequacy:** Plaintiff Abbey will fairly and adequately protect the

12   interests of the other Class members. Plaintiff Abbey's interests do not conflict with

13   the interests of the other Class members he seeks to represent. Plaintiff Abbey and

14   Plaintiffs generally have retained counsel experienced in complex class litigation,

15   and Plaintiffs intend to vigorously prosecute this action. The interests of the Class

16   members will be fairly and adequately protected by Plaintiff Abbey and Plaintiffs'

17   counsel.

18           e.      **Superiority:** Plaintiff Abbey and the other Class members have

19   all suffered and will continue to suffer harm and damages as a result of Defendants'

20   unlawful and wrongful conduct. A class action is superior to other available means

21   for the fair and efficient adjudication of the claims of the Class members. While

22   substantial, the damages suffered by each individual Class member do not justify the

23   burden and expense of individual prosecution of the complex and extensive litigation

24   required by Defendants' conduct. Further, it would be extremely burdensome for

25   Class members to individually and effectively redress the wrongs done to them. Even

26   if Class members themselves could afford individual litigation, the court system

27   could not. Individualized litigation presents a potential for inconsistent or

28   contradictory judgments. Individualized litigation increases the delay and expense to

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

all parties and the court system presented by the complex legal and factual issues of this case. By contract, the class action device presents far fewer management difficulties, and it provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Moreover, the litigation and trial of Plaintiff Abbey's and other Class members' claims is manageable.

## PARTIES

31.     Group A Plaintiffs are individual employees and former employees of the SFPD who are listed on Exhibit A hereto. Each Group A Plaintiff worked at HPNS for some duration between 1997 to the present, whether in a full-time, part-time, or intermittent capacity, and each was exposed to hazardous substances there.

32.     Group B Plaintiffs are the lawful spouses and domestic partners of Group A Plaintiffs, as specified within Exhibit B. Exhibit B, which identifies each Group B Plaintiff, is incorporated herein by this reference. Group B Plaintiffs, and each of them, have sustained a loss of consortium as a result of the Group A Plaintiffs' injuries.

33.     Group C Plaintiffs are surviving family members of deceased former employees of the SFPD who worked at HPNS for some duration between 1997 to the present, whether in a full-time, part-time, or intermittent capacity, and who were exposed to hazardous substances there.

34.     Tetra Tech EM, Inc. was and is a corporation formed in Delaware, with a principal place of business in San Francisco, California. Tetra Tech EM, Inc. was formerly known as PRC Environmental Management, Inc. (PRC). It was acquired by Tetra Tech, Inc. in or about 1995. On or about September 2, 1997, its name changed to Tetra Tech EM, Inc.

35.     Tetra Tech EC, Inc. was and is a wholly-owned subsidiary of Tetra Tech, Inc., formed in Delaware, with its principal place of business in Morris Plains, New Jersey. At all times relevant to this complaint, Tetra Tech EC, Inc. (including its predecessor companies) was a company providing remediation and construction

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

10

FIRST AMENDED COMPLAINT FOR DAMAGES - CASE NO. 3:19-CV-07510-JD

services worldwide, including to the United States federal government. On information and belief, Tetra Tech EC assumed all liabilities of its predecessor companies, including Foster Wheeler Environmental Corporation (Foster Wheeler) and Tetra Tech FW, Inc.

36.     Tetra Tech, Inc. is a Delaware Corporation, with a principal place of business in the City of Pasadena, County of San Diego, State of California.

37.     The use of the name "Tetra Tech" in this Complaint, unless otherwise specified, refers collectively to Tetra Tech EM, Inc. Tetra Tech EC, Inc., and Tetra Tech, Inc., as well as their predecessor companies, including Foster Wheeler Environmental Corporation, Tetra Tech FW, Inc., and PRC Environmental Management, Inc.

38.     At all times herein mentioned, Defendants, and each of them, were agents, servants, employees, partners, aiders and abettors, co-conspirators, successors, predecessors, and/or joint venturers of each of the other Defendants named herein and were at all times operating and acting within the purpose and scope of said agency, service, employment, partnership, enterprise, conspiracy, and joint venture, and each Defendant has ratified and approved the acts of each of the other remaining Defendants.

## JURISDICTION AND VENUE

39.     Federal enclave jurisdiction against Defendants exists pursuant to the United States Constitution, article 1, section 8, clause 17 (providing that the United States has jurisdiction "in all Cases whatsoever . . . over all Places purchased by the Consent of the Legislature of the State in which the same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings") because HPNS is a U.S. military shipyard purchased with the consent of the State of California, and is thus a "federal enclave."

40.     The Court may exercise personal jurisdiction over Tetra Tech pursuant to 31 U.S.C. § 3732(a) because Tetra Tech transacts business in this district.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

11

FIRST AMENDED COMPLAINT FOR DAMAGES - CASE NO. 3:19-CV-07510-JD

41.     Venue is proper in the Northern District of California under 31 U.S.C. § 3732(a), 28 U.S.C. 1402(b), and 28 U.S.C. § 1391 because Tetra Tech transacts business in this District, and because a substantial part of the events or omissions giving rise to the claim occurred in the Northern District of California.

## FACTUAL ALLEGATIONS

### A.     Hunters Point Naval Shipyard Administrative Background (1869-Present)

42.     The property that is referred to in this complaint as HPNS, but which has been known by other names as well, is a 965-acre former naval base (half of which is underwater), located in southeast San Francisco on a peninsula that extends eastward into the San Francisco Bay.

43.     In about 1869, HPNS began to be used as the first west coast drydock facility. It was operated by the California Drydock Company, with construction subsidized by the US Navy, for the purpose of docking both private and US Navy ships.

44.     In 1939, the US Navy purchased HPNS, and leased the subject base to Bethlehem Steel Company.

45.     In 1941, days after the United States entered World War II in response to the attacks on Pearl Harbor, the Navy took possession of HPNS. To support the war effort, the Navy constructed numerous buildings and excavated surrounding hills to expand the shoreline into the Bay. During this time, HPNS was used for the accelerated production of Liberty ships for use in World War II, as well as the modification, maintenance, and repair of Navy ships and submarines.

46.     For 23 years, from 1946-1969, the Naval Radiological Defense Laboratory (NRDL) operated at HPNS.

a.     The NRDL existed for the primary purposes of decontaminating radioactive ships, and broadly studying the nature and effects of ionizing radiation.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

FIRST AMENDED COMPLAINT FOR DAMAGES - CASE NO. 3:19-CV-07510-JD

b.      For the first 8 years, the NRDL operated under the command of the Shipyard Commander, with no regulatory oversight.

c.      Beginning in September 1955, the NRDL became a separate Navy command.

d.      Beginning in approximately 1958, the NRDL came under regulation by the Atomic Energy Commission (AEC), which subsequently became the Nuclear Regulatory Commission (NRC).

47.     In 1974, the Navy decommissioned HPNS as part of the Navy's broader Department of Defense Shore Establishment Realignment Program, and designated the base an "industrial reserve."

48.     In 1976, the Navy leased over 80% of HPNS to Triple A Machine Shop Incorporated (Triple A), a commercial ship repair company, for a five-year term, which was extended in 1981 for a second five-year term. Triple A Machine Shop vacated the shipyard in mid-1987.

49.     In 1984, the Navy initiated site investigations as part of the Navy's Internal Assessment and Control of Installation Pollutants (NACIP) program, subsequently renamed the Installation Restoration (IR) program, which is the Navy's internal regulatory scheme designed to identify and control environmental contamination from past hazardous materials use and disposal activities. In October 1984, pursuant to NACIP, the Navy released its Initial Assessment Study (IAS) Report, identifying twelve sites at HPNS where hazardous materials were disposed of or spilled.

50.     In 1985, the Navy announced its intention to reopen the base and homeport the USS Missouri at HPNS. The Navy resumed operation of the shipyard in 1986.

51.     From 1985 through 1988, the Navy received multiple remedial action orders and site cleanup orders from the California Department of Health Services (DHS), now the California Department of Toxic Substance Control (DTSC), and the

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

FIRST AMENDED COMPLAINT FOR DAMAGES - CASE NO. 3:19-CV-07510-JD

1  California Regional Water Quality Control Board (CRWQCB), ordering investigation

2  and remediation by both the Navy and Triple A.

3  52.   On November 21, 1989, based on the recent assessments and findings by

4  the Navy, DHS, and CRWQCB, the US EPA placed HPNS on the National Priorities

5  List (NPL), as a designated "Superfund" site governed by CERCLA as amended by

6  the Superfund Amendments and Reauthorization Act (SARA).

7  53.   Navy shipyard operations were permanently terminated on December

8  29, 1989.

9  54.   In about 1991, the Department of Defense Base Realignment and

10  Closure Commission selected HPNS for closure under the Base Closure Act of 1988,

11  Public Law [PL] 100-526, and the Defense Base Closure and Realignment Act of

12  1990, PL 101-510; 10 U.S.C. § 2687, as amended, 1991 (DBCRA).

13  55.   On January 22, 1992, the Navy entered into a Federal Facilities

14  Agreement (FFA) with the US EPA, DTSC, and the CRWQCB. The purpose of the

15  agreement was to "ensure that the environmental impacts associated with past and

16  present activities at [HPNS] are thoroughly investigated and appropriate remedial

17  action taken necessary to protect the public health, welfare and the environment."

18  The FFA established a procedural framework and schedule for cleanup actions, and

19  defined the HPNS base's five parcels (A through E), which could be remediated and

20  transferred individually.

21  56.   Pursuant to the 1992 FFA and federal regulation, prior to disposal or

22  transfer (including lease or sale) of HPNS or any of its parcels, the Navy was and is

23  required to meet the CERCLA requirements, and to comply with the Defense

24  Authorization Amendments, NEPA, the DBCRA, the FFA, and other laws,

25  regulations, and conditions.

26  57.   On January 21, 1994, the City and Navy executed a Memorandum of

27  Understanding establishing a process allowing for the parcel-by-parcel transfer, as

28  remediation of each parcel is completed and approved by the EPA, of HPNS to the

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

14

FIRST AMENDED COMPLAINT FOR DAMAGES - CASE NO. 3:19-CV-07510-JD

City for redevelopment.

58.     In February 1999, the US EPA deemed Parcel A to be fully remediated, removed it from the NPL and cleared it for purchase. The City purchased Parcel A in December 2004.

59.     At present, in the year 2019, the Navy is still engaged in investigation and remediation activities, through its contractors, in an attempt to meet the CERCLA requirements for the remaining four parcels at HPNS.

60.     For the past 28 years, from 1992 to 2019, the Navy (directly and through its contractors) has been attempting to conduct an environmental cleanup that meets the CERCLA and other applicable requirements, so that it can deed each parcel of HPNS to the City. The City, for the past 28 years, been waiting to purchase HPNS from the Navy.

**B.      For Decades, Large Quantities of Hazardous Substances Were Released throughout Hunters Point Naval Shipyard**

61.     From 1946 to 1989, the Navy owned HPNS and caused, allowed, and recorded in its agency files the widespread release of large quantities of radiological and non-radiological hazardous substances throughout HPNS. Specific releases of hazardous substances include but are not limited to the following.

**1.      Release of Radiological Contamination by the Naval Radiological Defense Laboratory (1946-1969)**

62.     In 1946, the United States conducted a pair of nuclear weapon tests (known as Operation Crossroads) at Bikini Atoll, to investigate the effects of nuclear weapons on warships. A fleet of 95 ships were assembled at Bikini Lagoon, and two nuclear weapons were detonated there. The extent of contamination was unforeseen. Almost the entire target fleet was drenched by falling water, and contaminated beyond redemption. The extent of radioactive fallout caused chemist Glenn Seaborg of the AEC to call the Bikini Atoll detonation "the world's first nuclear disaster."

63.     In 1946, the United States Navy established its NRDL at its San Francisco base, HPNS.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

15

FIRST AMENDED COMPLAINT FOR DAMAGES - CASE NO. 3:19-CV-07510-JD

64.     The original purpose of the NRDL was to manage the testing, decontamination, and disposition of ships contaminated in the Operation Crossroads nuclear disaster.

65.     For its first approximately 12 years, from 1946 to 1958, the NRDL operated under the command of the Shipyard Commander, with no regulatory oversight, with safety equipment consisting entirely of two Geiger counters. During this unregulated time period, NRDL engaged in activities that resulted in the widespread release of numerous hazardous materials throughout HPNS.

66.     From at least 1946 to 1951, the Navy engaged in unregulated efforts to cleanup radioactive ships, including but not limited to the following activities:

a.     The Navy brought the 79 "most heavily contaminated ships" from the Bikini Atoll test back to HPNS. At least 100 different radionuclides were brought back to HPNS in this manner.

b.     The Navy used deck swabs, sandblasting, acid, steam-cleaning, and other materials in an attempt to clean the ships at HPNS. The fine sand and dust created by sandblasting were initially airborne and were blown by the wind throughout the HPNS base.

c.     Since radioactivity cannot be neutralized, "decontamination" in practical effect meant merely moving contaminated material from the radioactive ships to the air, soil, and other materials at HPNS.

d.     The Navy burned more than 600,000 gallons of radioactively contaminated fuel oil that it had removed from the ships at HPNS. Again, the effect was not to destroy the radioactivity, but rather to move it from the fuel oil to the air and soil at HPNS.

e.     Navy records indicate that the NRDL decontamination processes were overseen and conducted by a "small band" of "junior Navy officers," who "carried out decontamination on a sort of trial and error basis." They formed "the first such [Radiological Safety] group ever organized." "[T]heir equipment consisted of one

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

16

FIRST AMENDED COMPLAINT FOR DAMAGES - CASE NO. 3:19-CV-07510-JD

1  coffee pot and six Geiger counters, only two of which worked."

2          f.      The efforts to decontaminate affected ships proved largely futile.

3  All but 9 of the original 95 ships eventually had to be destroyed.

4          67.     The NRDL's focus shifted in approximately 1950. From 1950-1958, the

5  NRDL at HPNS participated in every nuclear weapons test carried out by the United

6  States during that time period. Large amounts of highly radioactive nuclear weapons

7  debris were brought to HPNS from these A- and H-bomb tests, resulting in

8  widespread release of hazardous radioactive materials throughout HPNS. These pre-

9  1958 activities were performed without any regulatory oversight.

10         68.     From 1946 to 1969, the Navy used the HPNS site for the broad purpose

11  of studying nuclear contamination, and the first 8-9 years of this work was

12  unregulated. The NRDL nuclear research resulted in the widespread release of

13  hazardous radioactive materials throughout HPNS. Among other things, the NRDL:

14         a.      Conducted a wide variety of radiation experiments on materials

15  and animals at its HPNS laboratory buildings;

16         b.      Intentionally raised Animal Colonies on site, then intentionally

17  irradiated, studied, and disposed of tens of thousands of mice, rats, dogs, goats,

18  mules, and pigs, among other animals, at HPNS;

19         c.      Intentionally spread radioactive material at the HPNS base, as if

20  it were fertilizer, to practice decontamination;

21         d.      Conducted human experiments at HPNS, including requiring

22  people to drink radioactive elements.

23         e.      Constructed and used a cyclotron (a type of particle accelerator)

24  at HPNS for use in radiation experiments, which generated radiation and charged

25  particles;

26         f.      Received and stored radiological waste from the University of

27  California at Berkeley and Lawrence Livermore Laboratories.

28         69.     Additionally, the Navy manufactured radioactive sources on site. For

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

17

FIRST AMENDED COMPLAINT FOR DAMAGES - CASE NO. 3:19-CV-07510-JD

example, the Navy used large quantities of radium-226, strontium-90, tritium and promethium-147 for radioluminescent devices and deck markers. On-site radioactive paint shops produced these radioluminescent instruments, with radioactive wastes poured down drains and leaking into soil from breaks in sewer lines. An estimated 6000 pounds of radioluminescent dials and knobs were disposed of at the HPNS landfill site, and also strewn about the base.

70.     The Navy disposed of HPNS radioactive waste by placing irradiated animal carcasses and 55-gallon drums of radioactive waste on a barge, until the barge was full, then towing it out to the Farallon Islands (a National Marine Sanctuary) and sinking the waste there (sometimes by shooting holes in the drums to help them sink). AEC researcher Arnold Joseph estimated that 47,500 barrels of radioactive waste were processed in this manner.

71.     In 1958, the NRDL became a regulated facility licensed by the AEC.

72.     Pursuant to the NRDL's licenses with the AEC:

a.     The licensed amount of strontium-90 was sufficient to contaminate ten trillion tons of soil at or above the US EPA's preliminary remediation goals (PRGs).

b.     The licensed amount of uranium was enough to contaminate about 200 million tons of soil at or above US EPA's PRGs.

c.     The AEC allowed the NRDL to use 2000 grams of plutonium-239, a hazardous substance known to cause lung cancer if only one millionth of an ounce is inhaled.

### 2.     Navy's Release of Non-Radiological Hazardous Substances (1941-1974)

73.     From approximately 1942 to 1974, the Navy as part of its (non-NRDL) shipyard operations, used, released, and stored numerous hazardous substances throughout HPNS. These releases include but are not limited to the following specific instances of contamination.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

18

FIRST AMENDED COMPLAINT FOR DAMAGES - CASE NO. 3:19-CV-07510-JD

74.     From 1942 to 1977, sandblasting operations in the dry dock area discharged blasting grit, paint scrapings, metal rust, and other debris from cleaning ships (including nuclear-powered ships) into the Bay and throughout HPNS.

75.     From at least 1942 to 1977, the shipyard had a combined sanitary and storm sewer system. Industrial shop wastewater was discharged to this system and was pumped to the City's sewage collection system and treatment plant.

76.     In periods of high storm water runoff, which occurred about 9-12 times annually, diversion structures would direct the flow into the San Francisco Bay, including via overflow outlets near Berth 15 and southwest of Mahan and J Street.

77.     In 1975, a lawsuit filed by the Bay Area Water Quality Control Board was brought against the US Navy's Supervisor of Shipbuilding, Conversion and Repair (SUPSHIP) division, seeking to prohibit the ongoing direct discharge of sanitary and industrial wastes into the San Francisco Bay. In response to the 1975 lawsuit, the Navy conducted a project to separate storm drains from sanitary sewers at HPNS. This project was completed in 1977.

78.     From 1947 to 1973, the Navy operated a 120,000 square foot Pickling and Plate Yard on the north end of Hussey Street between Building 411 and 402. The operation of the Pickling and Plate Yard involved dipping steel plates into acid tanks, then drying the plates on racks and painting them with zinc chromate-based corrosion resistant primer. Sodium dichromate, sulfuric and phosphoric acids, and zinc chromate were used on site. Most of the structures were coated with acid and zinc chromate.

79.     The Navy created and used a succession of coal- and oil-fired power generation facilities which resulted in the release of hazardous substances throughout HPNS, both from smokestack effluvium and leftover byproducts that were dumped in the vicinity. Former Building 521 was a power plant.

\\\

\\\

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

FIRST AMENDED COMPLAINT FOR DAMAGES - CASE NO. 3:19-CV-07510-JD

### 3.   Triple A Machine Shop Release of Hazardous Industrial Substances (1976-1987)

80.     From 1976 to 1987, while HPNS remained under the Navy's ownership and control, Triple A conducted commercial ship repair operations at HPNS that resulted in widespread releases of hazardous substances, including instances of illegal dumping of hazardous wastes at more than 20 locations throughout HPNS.

81.     In 1986, the San Francisco District Attorney's Office charged Triple A with illegally disposing of hazardous wastes. In 1992, Triple A's management was convicted of five counts of illegal hazardous waste disposal at HPNS.

82.     In 1986, when the lease expired, Triple A refused to vacate. The Navy began legal proceedings which forced Triple A to vacate the facility in mid-1987.

83.     In 1988, following the discovery of PCB-contaminated waste oils at the southeast portion of Building 606, the Navy conducted an emergency removal action, removing about 1,255 cubic yards of soil with PCBs at concentrations exceeding 25 mg/kg. Excavation was conducted to depths ranging from 3 to 10 feet below the ground surface within an area measuring 50 by 150 feet.

84.     In 1984, an Initial Assessment Study team concluded that the Bay bottom sediments found immediately below the shipyard shoreline were contaminated with heavy metals and other hazardous pollutants.

### C.   The Transfer of Real Property to the City (Beginning in 1996)

85.     In 1996, and on other dates thereafter, the Navy transferred to the City real property at HPNS (the Subject Leased Property, including but not limited to the Building 606 Property and the Helipad Property, all defined hereinbelow), via lease contracts, knowing that the Subject Leased Property would be used by the City as work facilities for SFPD employees, including Group A Plaintiffs and Group C Decedents and each of them.

86.     This 1996 transfer was accompanied by false statements from the Navy and Tetra Tech, on which the City relied, misrepresenting the history of HPNS, and

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

FIRST AMENDED COMPLAINT FOR DAMAGES - CASE NO. 3:19-CV-07510-JD

misrepresenting the type and quantity of hazardous substances released at and about the leased property, as described in more detail below.

### 1.   The Subject Leased Property

87.    The SFPD, from 1997 to the present, has leased and occupied an 89,600 square foot steel-construction industrial building (Building 606) at HPNS, along with approximately 33,000 square feet of land surrounding Building 606 (hereinafter collectively referred to as the Building 606 Property).

88.    The Building 606 Property is bordered by 3rd Avenue to the north, Hussey Street to the east, H Street to the west, and the radiologically impacted sites of Former Buildings 507 and 508 to the south.

89.    The SFPD, from 1999 to 2007, also leased and occupied a 3.30-acre vacant lot adjacent to Building 606 for use as a helicopter landing pad (herein referred to as the Helipad Property).

### D.   Before It Could Transfer the Subject Leased Properties to the City, the Navy Was Legally Required to Disclose to the City the Type and Quantity of Hazardous Substances Released at and Around Building 606

90.    In 1996, pursuant to the FFA, CERCLA, and other regulations and agency policies, the Navy was required to accurately disclose, before leasing out the Subject Leased Properties, the type, quantity, and timing of any prior release of hazardous substances at the Subject Leased Properties, to the extent such information was available on the basis of a complete search of Navy files. These regulations and statutes include but are not limited to 42 U.S.C. § 9620(h)(1) (of CERCLA), which reads in pertinent part:

> [W]henever any department, agency, or instrumentality of the United States enters into any contract for the sale or other transfer of real property which is owned by the United States and on which any hazardous substance was stored for one year or more, known to have been released, or disposed of, the head of such department, agency, or instrumentality **shall include in such contract notice of the type and quantity of such hazardous substance and notice of the time at which such**

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

FIRST AMENDED COMPLAINT FOR DAMAGES - CASE NO. 3:19-CV-07510-JD

**storage, release, or disposal took place, to the extent such information is available on the basis of a complete search of agency files.** [Emphasis added.]

91.    The Navy is and was at all relevant times a department of the United States.

92.    At all relevant times, the Navy owned the Subject Leased Properties.

93.    HPNS, the Subject Leased Properties are real property.

94.    The Building 606 Property was, at all relevant times, real property on which hazardous substances were known to have been released and disposed, and where hazardous substances had been stored for one year or more.

95.    The Helipad Property was, at all relevant times, real property on which hazardous substances were known to have been released and disposed, and where hazardous substances had been stored for one year or more.

**E.    Beginning in or About 1996, Tetra Tech Negligently Misrepresented the Type and Quantity of Hazardous Materials Released at the Leased Properties, Causing the City to Enter into the Subject Lease Agreements**

96.    In April 1995, the Navy contracted with PRC using a flexible master contract, the Comprehensive Long-Term Environmental Action Navy (CLEAN II) contract no. N62474-94-D-7609 (hereafter CLEAN II Contract 7609), which could be applied to specific projects using add-on contract task orders.

97.    Pursuant to task order 012 (Contract 7609-012) PRC was required to and did prepare Environmental Baseline Surveys and Findings of Suitability to Lease for the express purpose of providing the legally required lease notifications to the City in connection with the lease of the Building 606 Property and the Helipad Property.

98.    In, about, and after 1995-1996, Tetra Tech EM, Inc., and Tetra Tech EM, Inc.'s predecessor corporation PRC, and each of them, negligently made false, misleading, and incomplete disclosures to the City, related to the release and use of

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

22

FIRST AMENDED COMPLAINT FOR DAMAGES - CASE NO. 3:19-CV-07510-JD

1    hazardous substances at the Subject Leased Properties.

2         99.    In, about, and after 1995-1996, PRC, and Tetra Tech EM, and each of

3    them, failed to provide notice of the type, quantity, and time of each release, storage,

4    and/or use of hazardous materials at the Subject Leased Properties.

5         100.   Contract 7609-012 required that, in conducting Environmental Baseline

6    Surveys, Tetra Tech would review all available information and survey the condition

7    of real property proposed to be acquired, transferred, leased, sold, or otherwise

8    conveyed, to determine the nature, magnitude, and extent of any contamination of

9    the Subject Leased Property, and provide notice when required under § 120(h) of

10   CERCLA of the type, quantity, and time frame of any storage, release, or disposal of

11   a hazardous substance on the property.

12        101.   Contract 7609-012 required that, in conducting Environmental Baseline

13   Surveys, Tetra Tech would identify, obtain, and review all data, documents, and

14   records relevant to determining the potential for present and past contamination of

15   the property. The contract provided that any such review shall include historical

16   records, and other available documents to ascertain prior uses of the real property

17   that may have involved hazardous substances or otherwise contaminated the

18   property.

19        102.   In January 1996, pursuant to Contract 7609-0012, PRC published its

20   Draft Basewide Environmental Baseline Survey for HPNS, which was later

21   published as the June 3, 1996 Final Basewide Environmental Baseline Survey (1996

22   Basewide EBS).

23        103.   The stated purpose of the 1996 Basewide EBS was in part to facilitate

24   the transfer of the HPNS base, and to fulfill the requirements of CERCLA as

25   amended by the Community Environmental Response Facilitation Act of 1992

26   (CERFA).

27        104.   The 1996 Basewide EBS stated that it was intended to "support

28   conclusions that portions or subparcels of the base, although not CERFA clean, are in

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

23

FIRST AMENDED COMPLAINT FOR DAMAGES - CASE NO. 3:19-CV-07510-JD

1    such a condition that the Navy may issue deeds to transfer the property on the basis

2    that "no remedial action is required."

3         105.    PRC, in its 1996 Basewide EBS erroneously stated that:

4              a.    Former Building 503 had never been used for past storage or use

5    of hazardous materials, and had no known history of hazardous materials, hazardous

6    waste, or radiological contamination.

7              b.    Building 606 had no history of hazardous material, hazardous

8    waste, or radiological contamination.

9              c.    Whereas virtually all other property at HPNS was "Category 6,"

10   indicating that additional work was needed, Building 606 alone was Category 4, an

11   "area where . . . all remedial actions have been taken" and "remedial actions are

12   complete . . . ."

13        106.    On February 7, 1996, pursuant to contract 7609-0012, PRC assisted the

14   Navy with the preparation of a Property Specific Environmental Baseline Survey for

15   Building 606 (the Building 606 EBS) and a Finding of Suitability to Lease for

16   Building 606 (Building 606 FOSL) and the surrounding area.

17        107.    The Building 606 EBS relied in part on the Draft Basewide EBS (which

18   was published by PRC pursuant to Contract 7609-0012) and the Parcel D Remedial

19   Investigation Draft Report (which was published by PRC pursuant to Contract 7609-

20   0005).

21        108.    The purpose of the Building 606 EBS was to provide a basis for the

22   Building 606 FOSL, to provide a basis for any recommended use restrictions for the

23   Building 606 Property, to establish the current physical and environmental

24   conditions of Building 606, and to comply with the Navy's obligations under CERCLA

25   § 9620(h) to disclose the full history of the release of hazardous substances at the

26   Building 606 Property.

27        109.    The Building 606 EBS included numerous material misrepresentations,

28   regarding the release of hazardous substances at and including but not limited to the

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

24

FIRST AMENDED COMPLAINT FOR DAMAGES - CASE NO. 3:19-CV-07510-JD

following:

     a.     [T]here are no known health risks associated with the use of Building 606 for office administration and staging by the SFPD.

     b.     Former Building 503, which was on the Building 606 site, "did not have uses consistent with the storage or use of hazardous materials."

     c.     During the NRDL years, HPA was used for "limited radiological operations."

     d.     As part of the disestablishment of NRDL all sites were surveyed for radiological contamination and decontaminated if necessary. No radiological hazards are expected.

     e.     The IR-08 PCB spill area was "previously remediated."

     f.     "[R]emedial actions are complete" at the Building 606 Property.

     g.     The condition of all the spaces [in Building 606] is excellent with no signs of the use, storage, or spillage of hazardous materials or petroleum products."

     h.     "There are no potential interior sources" of hazardous exposure in Building 606.

     i.     Known contamination of Parcel D steam lines with TPH-gasoline, oil, grease, and mercury is not of concern at Building 606 because "[t[[here are no steam lines indicated in or around Building 606."

110.    The February 7, 1996 Building 606 FOSL was written in explicit reliance on the Building 606 EBS. It contained no additional information regarding the release of hazardous substances at the Building 606 Property, beyond that information contained in the Building 606 EBS. It concluded that the "lease does not present a risk to human health of the future lessee or the environment if the restrictions and requirements as detailed above are followed."

111.    In December 30, 1996, in reliance upon the Building 606 EBS and the Building 606 FOSL, which had been prepared by Tetra Tech, the Redevelopment

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

25

FIRST AMENDED COMPLAINT FOR DAMAGES - CASE NO. 3:19-CV-07510-JD

1   Agency of the City of San Francisco (SFRA) entered into lease contract

2   N6247497RPOOP45 (the "Subject Lease") for the transfer (lease) of real property,

3   specifically the Building 606 Property, with the stated intention that it would be

4   subleased to the SFPD. The leased premises were described therein as follows:

> Government does hereby lease, rent, and demise to Lessee and Lessee
> does hereby hire and rent from Government, Building 606 and adjacent
> parking areas to be used to house the following units of the [SFPD]:
> Field Operations Bureau, which includes the Canine Unit; Muni Detail
> Unit; Tactical Squad Unit; Property Control Unit; Narcotics Unit; and
> the Police Department's Crime Lab.

9   112.   The Subject Lease was accompanied by the Building 606 FOSL and

10  Building 606 EBS.

11  113.   Together, the lease and its attachments failed to accurately represent

12  the type and quantity of hazardous substances released at and about the Building

13  606 Property, and contained numerous other material representations related to the

14  hazards associated with occupancy and use of the Building 606 Property.

15  114.   The Subject Lease, along with the Building 606 FOSL and Building 606

16  EBS, were created with the intention that they would be sent to, and relied upon by,

17  the SFPD and its employees in deciding whether to sublease and use the Building

18  606 Property.

19  115.   The Subject Lease, along with the Building 606 FOSL and Building 606

20  EBS, were in fact sent to, and relied upon by, the SFPD and its employees in deciding

21  whether to sublease and use the Building 606 Property.

22  116.   On May 1, 1997, the SFPD, in reliance on the negligent

23  misrepresentations and concealment of PRC, and Tetra Tech EM, and each of them,

24  subleased the Building 606 Property from the SFRA, and began stationing SFPD

25  employees, including Group A Plaintiffs and Group C Decedents, at and about the

26  Building 606 Property.

27  \\\

28  \\\

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

26

FIRST AMENDED COMPLAINT FOR DAMAGES - CASE NO. 3:19-CV-07510-JD

1

**F.     Before 1996, a Complete Search of the Navy's Files Would Have
Revealed that Voluminous Hazardous Substances, Including
Radionuclides, Were Known to Have Been Released at and
Around the Subject Leased Properties and that the Lease
Representations Were False**

117.    Tetra Tech (including Tetra Tech EM, and PRC) negligently failed to
provide notice to the City of the type and quantity of hazardous substances released
at the Building 606 Property, which information was available from a complete
search of agency files.

118.    PRC, Tetra Tech EM, and each of them, in the Subject Lease,
negligently and materially misrepresented the history of HPNS and the Building 606
Property.

119.    The radiologically-impacted site of Former Building 503 is fully
incorporated within the footprint of Building 606.

120.    The Building 606 Property includes within it the radiologically-impacted
sites of Former Buildings 501, 502, 503, and 504, as well as radiologically-impacted
steam lines, sewer lines, and storm drain lines.

121.    The statement in the Building 606 EBS that Former Building 503 "did
not have uses consistent with the storage or use of hazardous materials," was false
when made, and contrary to existing records.

a.     The 500-series buildings, of which Former Building 503 was a
central building, constituted the first site of the NRDL at HPNS, during the period of
heaviest radioactive cleanup activity, and lowest regulatory oversight.

b.     Pre-1996 Navy records stated that, during operation of the
NRDL, radioactivity in the area of the 500-series buildings (which include Building
503) was such that the Navy found it could not continue carrying out biological
medical research work in Building 506 since it was, according to a November 1948
Navy report, "located among a group of chemistry laboratories where prevailing
levels of radioactivity render the delicate detection incident to the biological
investigations impossible."

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

27

FIRST AMENDED COMPLAINT FOR DAMAGES - CASE NO. 3:19-CV-07510-JD

c.      Former Building 503 was used from approximately 1946 to 1955 as a radioactive laundry, where harsh chemicals including sodium hypochlorite were used to repeatedly clean radioactive clothing and protective apparel.

d.      A series of memoranda in 1946 document that a new laundry was being installed in Building 503, jointly by "Crossroads" (the NRDL project) and by SUPSHIP.

e.      A 1949 HPNS map, shows that, during that time period of peak radioactive activity, Building 503 was the base's only laundry facility.

f.      A January 4, 1952 NRDL Bulletin referred to Building 503 as the "NRDL laundry."

g.      An April 10, 1953 Navy document described the "U.S. Naval Radiological Defense Laboratory Clothing Decontamination Procedure." Under the procedure, all clothing was assessed for excessive radiological contamination. Any clothing found to be excessively contaminated was to be washed using 1/2 pound of Versene Soap and 1/2 pint of sodium hypochlorite, along with hot water, for 30 minutes, rinsed in hot water, washed again with 1/4 pound of Versene soap for another 20 minutes, and transferred to the extractor to remove all water possible. This procedure was repeated three times, upon which any clothing that still did not meet tolerance levels would be "either stored until the radioactive decay reduces the intensity to this level or it must be disposed of as radioactive waste."

h.      A February 1, 1955 special report from the Commanding Officer of the NRDL to the Chief of SUPSHIP, declassified in 1991, stated:

> The San Francisco Naval Shipyard has, pending completion of Building 815, allowed NRDL personnel to use the space and equipment in Building 503 . . . . Clothing and apparel accepted at the subject facility is limited to items that have been exposed to radioactive contamination, and the sole purpose is to reduce the radiological contamination to the accepted safe level....All SFNS "hot" clothing received at the subject facility is monitored, processed, re-monitored, and returned to SFNS for laundering and pressing as required. . . . This clothing decontamination facility is housed in one room of SFNS Building 503 . . . .

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

28

FIRST AMENDED COMPLAINT FOR DAMAGES - CASE NO. 3:19-CV-07510-JD

> The service consists of reducing the level of contamination
> in Navy-owned protective wearing apparel to the point
> where it can safely be sent to a Navy-operated or
> commercial laundry. . . . The equipment used consists of
> two industrial-type washing machines, two extractors, and
> one dryer.

     i.     Two grease traps related to the radioactive laundry facility were located south and west of Building 503 until the 1980s.

     j.     Building 503 was also reportedly used, from approximately 1946 to 1955, to house a small animal (radioactive) exposure facility.

122.    The statement in the Building 606 EBS that known contamination of Parcel D steam lines with TPH-gasoline, oil, grease, and mercury is not of concern at Building 606 because "[t]here are no steam lines indicated in or around Building 606" was false when made, and contrary to existing records.

123.    In fact, pre-1996 Navy records showed that a steam line near Building 503 had been used by Triple A in the 1970s and 1980s to transport waste oils containing polychlorinated biphenyls (PCBs), that, in the early 1980s, a section of this line broke, spilling an unknown quantity of waste oils and PCBs directly onto the Building 606 Property; and that the spill was not fully remediated at any point prior to 1996.

124.    Pre-1996 Navy records showed that Polynuclear Aromatic Hydrocarbons (PAHs) had been discovered at or near the southeast corner of the Building 606 Property. However, this was not disclosed to the City in connection with the Subject Lease.

125.    Pre-1996 Navy records showed that an unknown number of electrical transformers containing PCB oil had stored a transformer pad on the south side of Former Building 503, and that two transformers containing PCB oil were located on power poles north and south of Former Building 503, until 1988. These transformers were removed from service by American Environmental Management Corporation (AEMC) and the Navy Public Works Department in 1988. However, this information

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

FIRST AMENDED COMPLAINT FOR DAMAGES - CASE NO. 3:19-CV-07510-JD

1   was not disclosed to the City in connection with the Subject Lease.

2   126.   The statement in the Building 606 EBS that the condition of all the

3   spaces [in Building 606] is excellent with no signs of the use, storage, or spillage of

4   hazardous materials or petroleum products" was false when made, and contrary to

5   existing records.

6   a.   In fact, a walk-through of Building 606 in 1996, as described in

7   the Basewide EBS, revealed evidence of recent use of hazardous materials in

8   Building 606, including a "large stain in northwest section of shop," "stained

9   cardboard run[ning] from southeast rollup door to outside drain," as well as "six 30-

10   gallon black Nalgene drums (four on east side, two on west; PVC pipes run from

11   building and drop into these drums)."

12   127.   The statement in the Building 606 EBS that, during the NRDL years,

13   HPA was used for "limited radiological operations," was false when made and

14   contrary to existing records, which showed that HPA had been used for some of the

15   most extensive radiological operations in history, as described hereinabove.

16   128.   The statement in the Building 606 EBS that, as part of the

17   disestablishment of NRDL all sites were surveyed for radiological contamination and

18   decontaminated if necessary," was false when made and contrary to existing records.

19   129.   In fact, the Navy's pre-1996 records demonstrate that Building 503 was

20   never decontaminated or remediated.

21   a.   In 1955, the NRDL began consolidating most of its facilities from

22   the 20 widely-separated Shipyard buildings to its own new Building 815, a 6-story

23   windowless structure of reinforced concrete, and Building 816 which housed the 2-

24   million electron volt Van de Graaff accelerator, as well as 250 Kev x-ray machines

25   and eight-curie cobalt source.

26   b.   In 1955, using the limited radiological detection equipment

27   available at the time and in an era before the development of survey or

28   decontamination procedures, the NRDL conducted its own surveys of NRDL

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

30

FIRST AMENDED COMPLAINT FOR DAMAGES - CASE NO. 3:19-CV-07510-JD

1    Buildings 313, 313A, 322, 351, 351A, 366 (formerly known as 351B), 506, 507, 508,

2    and 510 and, despite noting evidence of contamination of the sewer systems and

3    drain lines, released these buildings for unrestricted use.

4         c.    The 1955 cleanup did not include remediation of soil and

5    groundwater.

6         d.    The 1955 cleanup did not include Building 503 or the surrounding

7    area.

8         e.    The consolidation of activities in Building 815 did not include all

9    activities of NRDL. Buildings 364, 365, 506, 529, 707, 816, 820, 821, 830, 831, and

10   ICW 418 were also used by NRDL until it closed in 1969.

11        f.    In April 1969, the Navy's Chief of Naval Material issued an

12   announcement that the NRDL would be disestablished (closed).

13        g.    In the nine months between April 1969 and January, 1970, the

14   NRDL Health Physics Division engaged in efforts, using then-existing standards,

15   methods, and equipment, to decontaminate Buildings 364, 506, 529, 707, 815 and

16   816.

17        h.    The 1969 cleanup effort used guidelines that are unsafe by

18   modern standards.

19        i.    The 1969 cleanup did not include remediation of soil and

20   groundwater.

21        j.    The 1969 cleanup did not include Building 503 or the surrounding

22   area.

23        k.    Between 1969 and 1979, it became known to AEC scientists that

24   the radiation standards of 1969 were inadequate and unsafe.

25        l.    In 1979, in recognition that the 1969 decommissioning standards

26   were unsafe by 1979 standards, the Navy conducted a second effort at radioactive

27   decontamination. These 1979 decontamination efforts, conducted by the Navy

28   SUPSHIP, in consultation with the Navy Radiological Affairs Support Officer of the

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

FIRST AMENDED COMPLAINT FOR DAMAGES - CASE NO. 3:19-CV-07510-JD

1    Naval Nuclear Power Unit, included only buildings 364, 815, and 816.

2            m.      The 1979 cleanup did not include any base-wide remediation of

3    soil and groundwater.

4            n.      The 1979 cleanup did not include the Building 503 site or the

5    surrounding area.

6            o.      In or about the 1970s, Building 503 was demolished. On

7    information and belief, no original records related to the demolition of Building 503

8    have been found, and the demolition of Building 503 was not associated with any

9    radiological remediation. On information and belief, the foundation of Building 503

10   was left in place at the time of its demolition. A 21,000-gallon AST used to store fuel

11   oil was also associated with Building 503 and was also reportedly demolished at an

12   unknown time.

13           p.      In approximately 1989, Building 606 was built on top of the site

14   of Former Building 503. On information and belief, this construction caused a steam

15   line beneath the Building 606 Property to break, causing a spill of hazardous PCB oil

16   into the Building 606 Property. In or about 1989, soil excavated from beneath

17   Building 503 was spread around Former Buildings 507 and 508, as well as in the

18   "laydown" area depicted in the following image. (In the following image, Building 606

19   is outlined in red, Former Building 503 is filled in yellow, and the laydown area is

20   depicted as a series of light blue squares.



FIRST AMENDED COMPLAINT FOR DAMAGES - CASE NO. 3:19-CV-07510-JD

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

130.   Additionally, pre-1996 records showed that, in fact, the soil, steam lines, storm drains, and sanitary sewer that were known to be radiologically contaminated during the NRDL's operation had never been systematically decontaminated.

    a.   Pre-1996 Navy records showed that the storm drain lines throughout HPNS, including at the Building 606 Property, were contaminated, including with radionuclides Cs-137, Ra-226, and Sr-90. In the 1940s, the system had been built as a combined sanitary and storm sewer system using the same conveyance piping. During storm events, storm water flows would overwhelm the pump at Building 819 and much of the sewage and storm water was diverted to various existing outfalls in the Bay. Despite a series of separation projects, complete separation of the combined systems was never achieved. Due to the evolutionary nature of the separation process, radiological contamination from the same source could have impacted the piping and other components of both systems.

131.   The statements by PRC, in the Building 606 EBS, that "[n]o radiological hazards are expected," that "there are no known health risks associated with the use of Building 606 for office administration and staging by the SFPD," that Building 606 belonged in category 4, that there are "no potential interior sources" of hazardous exposure in Building 606 were negligently made.

    a.   The Navy's 1996 lease of the Building 606 Property to the City occurred after the 1975 lawsuit by the Bay Area Water Quality Control Board for illegal discharges of waste, after the 1984 Initial Assessment Study identifying 12 contaminated sites, after the DHS and CRWQCB remedial action orders demanding cleanup in the mid-1980s, after the US EPA's 1989 order listing HPNS listed as an NPL Superfund site, after the 1992 criminal convictions of Triple A for illegal dumping, and after the 1992 FFA ordered thorough investigation and remedial action.

    b.   As of 1996, the Building 606 Property was the site of numerous releases of hazardous substances, both known and unknown.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

FIRST AMENDED COMPLAINT FOR DAMAGES - CASE NO. 3:19-CV-07510-JD

1          c.     As of 1996, the presence of hazardous substances at and about the

2  Building 606 Property were never thoroughly studied, and future studies were

3  known to be needed.

4          d.     Among other things, as of 1996, internal sources of contamination

5  that had not been studied at the Building 606 Property included the water supply,

6  the sanitary sewer (which was connected to the storm drain system and known to

7  back up into Building 606), and the large rollup doors which free communication with

8  external airborne contamination.

9          e.     As of 1996, the Building 606 Property was not remediated.

10          f.     The Navy's transfer of the Building 606 Property to the City

11  occurred before the responsive CERCLA remediation had been completed or

12  approved.

**G.    After 1996, While Plaintiffs Were Working at Hunters Point Naval Shipyard, Tetra Tech Negligently Performed and Supervised the HPNS Remediation, Fraudulently Misrepresenting the True Extent of Hazardous Contamination Affecting Plaintiffs' Safety, and Increasing Plaintiffs' Exposure to Hazardous Substances**

17     132.   From 2003 through 2014, the Navy entered into a series of contracts

18  with Tetra Tech, including its predecessor company Foster Wheeler Environmental

19  Corporation, as well as Tetra Tech EC, Inc. and Tetra Tech, Inc. to provide

20  remediation services at HPNS (the Remediation Contracts). These contracts required

21  Tetra Tech, among other things, to investigate radiological contamination of soil and

22  buildings, remediate and remove waste as necessary, and provide status reports to

23  the Navy.

24     133.   The stated objective of the Remediation Contracts was to achieve "free-

25  release" of radiologically impacted areas by testing soil and buildings in those areas,

26  and remediating as necessary until test results demonstrated that radiation levels

27  were below applicable release criteria and regulatory limits.

28     134.   Pursuant to the Remediation Contracts, Tetra Tech was required to:

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

34

FIRST AMENDED COMPLAINT FOR DAMAGES - CASE NO. 3:19-CV-07510-JD

1      a.      Prevent the spread of contamination, provide for the safety of all

2  individuals in the vicinity of the work site areas (including Group A Plaintiffs and

3  Group C Decedents), prevent the release of any contamination to the environment,

4  and properly dispose of all investigation derived waste.

5      b.      "[M]aintain the work site to: prevent the spread of contamination,

6  . . . provide for the safety of all individuals in the vicinity of the work site areas, and

7  prevent the release of any contamination to the environment."

8      c.      Prepare a Health & Safety Plan to protect project personnel and

9  the general public from exposure to hazardous substances.

10     d.      Engage in "risk communication" with the community, including

11  the City and Group A Plaintiffs and Group C Decedents, on behalf of the Navy.

12  135.   At all relevant times, Tetra Tech negligently and fraudulently

13  performed its Remediation Contracts at HPNS, intentionally concealing the true

14  extent of contamination at HPNS.

15  136.   Because Tetra Tech fraudulently concealed the true extent of

16  contamination at HPNS, it processed contaminated soil as if it were clean soil,

17  thereby bypassing safety protections and causing Group A Plaintiffs' and Group C

18  Decedents' exposure to hazardous substances from throughout the base.

19  137.   Tetra Tech's activities that increased Group A Plaintiffs' and Group

20  Decedents' exposure to hazardous substances included but are not limited to the

21  following:

22     a.      Moving thousands of truckloads of contaminated soil throughout

23  the HPNS base, in such a manner that the soil dropped onto roadways used by Group

24  A Plaintiffs and Group C Decedents, was reintrained by vehicles, and became

25  airborne as contaminated particles inhaled, ingested, and dermally contacted by

26  Group A Plaintiffs and Group C Decedents.

27     b.      Using contaminated soil as backfill, and placing it in piles near

28  Building 606, in such a manner that contaminated particles became airborne and

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

35

FIRST AMENDED COMPLAINT FOR DAMAGES - CASE NO. 3:19-CV-07510-JD

1  were inhaled, ingested, and dermally contacted by Group A Plaintiffs and Group C

2  Decedents.

3          c.      Intentionally locating RSYs nearby to, and surrounding, Building

4  606, such that contaminated surface and underground soil from throughout HPNS

5  was daily spread out and processed in the RSYs adjacent to Building 606, and caused

6  Group A Plaintiffs and Group C Decedents to be exposed to, inhale, and touch

7  airborne particulate matter from the RSYs.

8          138.   Tetra Tech negligently reassured the City, and Group A Plaintiffs and

9  Group C Decedents, both directly and through individuals at the Navy and City

10  whom Tetra Tech knew would relay the information to Group A Plaintiffs and Group

11  C Decedents, that HPNS and the Subject Leased Property in particular remained

12  safe for the City and Group A Plaintiffs' and Group C Decedents' continued use

13  during the remediation, and that Group A Plaintiffs and Group C Decedents were not

14  being exposed to hazardous substances.

15         139.   Tetra Tech knew or should have known that these representations were

16  false when it made them.

17         140.   Tetra Tech knew or should have known that the City, and Group A

18  Plaintiffs and Group C Decedents, were using the Subject Leased Property for

19  outdoor training, dirt-biking, biking, running, crawling, drilling, police helicopter

20  use, and other activities that brought them into contact with contaminated soil, air,

21  and water, and Tetra Tech knew or should have known that, even when indoors,

22  Group A Plaintiffs and Group C Decedents had to keep windows open for ventilation

23  and were not protected from external contamination and dust.

24         141.   The City and Group A Plaintiffs and Group C Decedents, in reliance on

25  Tetra Tech's representations regarding safety, continued to use and occupy the

26  Subject Leased Property and the roadways and other land at HPNS.

27         142.   Tetra Tech's fraud includes but is not limited to (1) its

28  misrepresentation of the source of soil samples submitted to the laboratory for

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

36

FIRST AMENDED COMPLAINT FOR DAMAGES - CASE NO. 3:19-CV-07510-JD

testing, (2) its manipulation of data from radiological testing of buildings, and (3) its reports of false results from the radiological soil and building tests.

143.   At all relevant times, Tetra Tech knew and intended that its fraudulent representations regarding its findings at HPNS would be communicated to the City (including the SFRA, the SFPD, and individual employees of the SFPD) both directly by Tetra Tech and indirectly through the Navy.

144.   At all relevant times, Tetra Tech knew and intended that its fraudulent representations regarding its findings at HPNS were being relied upon by the City (including the SFRA, the SFPD, and the individual employees of the SFPD) in deciding to renew the lease of Building 606, and to continue conducting SFPD business at the HPNS base.

145.   Tetra Tech routinely used mail, telephone, and other electronic means of communication when communicating these fraudulent misrepresentations to the City. These communications constituted mail and wire fraud, which are predicate acts under the RICO statute.

146.   Tetra Tech whistleblowers, in declarations that were originally submitted under seal in False Claims Act litigation, and in declarations that were submitted to the Nuclear Regulatory Commission, admitted to systematic fraudulent activity by Tetra Tech at HPNS, including but not limited to the following:

   a.   For radiological scans of buildings throughout HPNS, Tetra Tech manipulated and falsified building scan data it provided to the Navy, rather than providing actual radiation detection results from a full building survey. Duplicated strings of data have thus far been discovered in the results of surveys conducted in 14 of 28 buildings.

   b.   In or about July of 2006, Tetra Tech began speeding up (to a speed of 6-9 times the approved speed) a conveyor belt system that was used to run potentially contaminated soil through a radiation scanner in order to decrease identification and remediation of radiological contamination of the soil, taken from

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

FIRST AMENDED COMPLAINT FOR DAMAGES - CASE NO. 3:19-CV-07510-JD

1   the PCB Hot Spot and IR-02. Tetra Tech also took actions to cripple the conveyor belt

2   system's ability to detect radiation by intentionally disabling its radiation detection

3   alarm.

4       c.      When Tetra Tech sampled contaminated soil and found that it

5   was too contaminated to be released, Tetra Tech intentionally and fraudulently

6   collected soil from different areas known to have lower radioactivity, and represent

7   that those samples had come from the location being investigated.

8       d.      Tetra Tech falsified chain-of-custody forms to support the false

9   sample collection information.

10       e.      Samples, data, and analytical results were discarded when the

11   results were above the release criteria.

12       f.      During the screening of soil at RSYs, Tetra Tech pulled the towed

13   array (scanning device) at speeds much higher than proper procedure dictated, in

14   order to intentionally reduce the probability of radiation detection.

15       g.      Tetra Tech intentionally used handheld detectors improperly to

16   reduce the probability of radiation detection.

17       h.      Tetra Tech blocked the shipment of samples to an offsite lab if

18   there was a high chance that the release criteria would be exceeded.

19       i.      Tetra Tech watered down soil before scanning it to reduce the

20   probability of radiation detection.

21       j.      At the portal monitors designed to detect high levels of gamma

22   radiation in trucks leaving HPNS, Tetra Tech decreased the sensitivity of scanners,

23   wetted the soil, and scanned through the steel sides of the trucks rather than over

24   the top of the soil, all in order to decrease the probability of radiation detection.

25       k.      In a December 1, 2017 Draft Radiological Data Evaluation

26   Findings Report for Parcel E Soil, the Navy found evidence of potential data

27   manipulation or falsification at 26 out of 57 trench units, evidence of biased sample

28   collection (to avoid the highest gamma scan measurements) at 64 out of 96 fill units,

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

38

FIRST AMENDED COMPLAINT FOR DAMAGES - CASE NO. 3:19-CV-07510-JD

1   and evidence of potential data manipulation or falsification at 61 out of 102 building

2   site survey units.

3   147.   The whistleblower allegations have been corroborated with findings that

4   indicate widespread fraud in the HPNS remediation efforts, including but not limited

5   to the following findings:

6   a.   The December 1, 2017 Draft Radiological Data Evaluation

7   Findings Report for Parcel E Soil specifically found evidence of fraudulent

8   investigation, including but not limited to sample collection, gamma scanning

9   techniques, and data manipulation, at Trench Survey Units 300, 309, 310, 311, which

10   include Former Building 503 Site Survey Units 12, 15, 16, 18, 23, 24, 31, 34, 35;

11   b.   On December 27, 2017, in reviewing the Draft Radiological Data

12   Evaluation Findings Reports for Parcels B and G Soil, the US EPA acknowledged

13   that 97% of survey units in Parcel B were suspect;

14   c.   The US EPA found signs of falsification in 100% of Parcel D-2

15   sampling data, 100% of UC-1 sampling data, 95% of UC-2 data, 97% of UC-3 data,

16   90% of Parcel B radiological data, 97% of Parcel G radiological data,

17   148.   According to Whistleblower Bowers, "soil that was contaminated with

18   non-radiological contamination, such as oils, PCBs, or asbestos, once processed on the

19   RSY pads and cleared, went through a portal monitor and was shipped off Hunters

20   Point to third-parties. Soil that did not have these other forms of contamination, once

21   processed through the RSY pad and the samples approved by the lab, were returned

22   to Hunters Point and used as backfill for the trenches on site. It was much less

23   expensive for Tetra Tech to have the soil falsely cleared for use as backfill, than to

24   have the soil repeatedly subjected to remediation of radiological contamination, and

25   the associated time and expense of separating the non-impacted soil from portions

26   with elevated radioactive contaminants that would have to be shipped to a low level

27   rad waste infill."

28   149.   According to Whistleblower Bowers, "very, very high percentages" of the

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

39

FIRST AMENDED COMPLAINT FOR DAMAGES - CASE NO. 3:19-CV-07510-JD

1   soil removed from Hunters Point were deemed "cleared," and used as backfill into the

2   Hunters Point trenches.

3       150.   On March 15, 2017, Tetra Tech manager Stephen Rolfe pleaded guilty to

4   destruction, alteration, or falsification of records in violation of 18 U.S.C. § 1519.

5   Rolfe admitted that he had instructed other Tetra Tech employees to get "clean dirt"

6   from areas known to be clean and taken from outside the marked Survey Unit areas

7   to be used as substitute samples for the dirt from the Survey Unit, and that he

8   falsified chain of custody forms.

9       151.   On May 18, 2017, Tetra Tech manager Justin Hubbard pleaded guilty to

10  destruction, alteration, or falsification of records in violation of 18 U.S.C. § 1519, and

11  admitted substantially the same fraudulent conduct as Stephen Rolfe had admitted.

12      152.   On May 3, 2018, Tetra Tech supervisors Justin Hubbard and Stephen

13  Rolfe were sentenced to eight months in federal prison for falsifying records. Both

14  admitted that they were repeatedly ordered by supervisors to "get the hell out" of

15  contaminated areas and to "get clean dirt." They admitted that, in response to this

16  pressure, they substituted 5-gallon buckets of clean soil for potentially contaminated

17  soil at HPNS, and then filled out fraudulent chain of custody forms, which were

18  submitted to the Navy as evidence that the soil was free of harmful radiation.

19      153.   While remediation activities were ongoing, Building 606 was transferred

20  from Parcel D to Parcel E to intentionally delay its investigation and remediation.

21  **H.    As a Result of the Foregoing, Plaintiffs Were Exposed to**
        **Hazardous Substances and Injured**

22

23      154.   Group A Plaintiffs and Group C Decedents, and each of them, were

24  exposed via inhalation, ingestion, and dermal exposure, as well as other exposure

25  routes, to radiological and non-radiological contamination at HPNS, resulting in

26  cellular, immunologic, acute, and chronic injuries to them.

27      **1.    Extensions and Expansions of the Subject Lease**

28      155.   The Subject Lease was originally set to expire June 30, 1998.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

40

FIRST AMENDED COMPLAINT FOR DAMAGES - CASE NO. 3:19-CV-07510-JD

156.    On July 1, 1998, as a proximate and legal result of the City's original lease of the Building 606 Property, the Subject Lease was extended for an additional six-month period expiring December 31, 1998 (1998 Amended Lease).

157.    On February 1, 1999, as a proximate and legal result of the City's lease of the Building 606 Property, the Subject Lease was amended to add to the scope of the lease a 3.3-acre vacant lot area east of Building 606 and across Hussey Street (the Helipad Property), labeled "Proposed HLP Area" in the map below, for construction and use as a helicopter landing facility. (This February 1, 1999 lease is hereafter referred to as the 1999 Amended Lease.) The 1999 Amended Lease was for a term originally set to expire June 30, 2002. The 1999 Amended Lease also extended the lease term for the Building 606 Property through June 30, 2002.



158.    On September 30, 2002, as a proximate and legal result of the original Subject Lease, the Lease Agreement N6247497RPOOP45 was amended a fourth time so that it would continue to automatically extend on a month-to-month basis.

159.    Effective February 1, 2007, the 1997 Lease of the Helipad Property terminated and the SFPD no longer leased that 3.3-acre vacant lot area east of Building 606.

160.    As a direct and legal result of the ongoing lease of the Subject Leased Property by the SFPD, the SFPD also conducted training activities (during the same time period) near the Subject Leased Property as well as in Parcel A, with the Navy and Tetra Tech's approval and consent. In June 1998, pursuant to Navy contract

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

41

FIRST AMENDED COMPLAINT FOR DAMAGES - CASE NO. 3:19-CV-07510-JD

1  number N62474998RP00P79, the Navy granted the SFPD authority to use Parcel A

2  for training exercises.

3      161.   Most but not all of Group A Plaintiffs and Group C Decedents were

4  relocated off base by 2009.

5      162.   SFPD's lease of the Building 606 Property is continuing, and some

6  Group A Plaintiffs have continuing exposure.

7          **2.      Hazardous Substances Present at the Building 606
                      Property**

8

9      163.   Building 606 had been built in 1989 as a Shore Intermediate

10 Maintenance Facility. It is an 89,600 square foot steel-construction industrial

11 building. The front part (north end) of the building includes an entry lobby and 2

12 stories of office and conference room spaces. The rear of the building (south portion)

13 is a 2-story high bay open area with concrete flooring.

14     164.   Building 606 was at all relevant times the site of dangerous

15 unremediated radionuclides, given that it had been the location of a radioactive

16 laundry that had discharged radioactive waste into the soil and groundwater under

17 and immediately around Building 606, and given that there had never been

18 remediation of that radioactive waste.

19     165.   Building 606 was at all relevant times the site of contamination,

20 including PCB oil, from on-site transformers.

21     166.   Sampling at Building 606 discovered volatile organic compounds

22 (VOCs), semivolatile organic compounds (SVOCs), total petroleum hydrocarbons

23 (TPHs), total organic gasses (TOGs), and metals detected in soil.

24     167.   Polyaromatic hydrocarbons (PAHs) were discovered in the groundwater

25 at Building 606.

26     168.   A soil pit at the southeast corner of Building 606 was the site of a PCB

27 spill and, at all relevant times, of continuing PCB contamination that had not been

28 fully remediated.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

FIRST AMENDED COMPLAINT FOR DAMAGES - CASE NO. 3:19-CV-07510-JD

169.   During Building 606's operation as the radioactive laundry, it had been the site of a solvent (trichloroethane) spill.

170.   While Group A Plaintiffs and Group C Decedents were working at Building 606, the bay doors and windows were often left open, allowing free communication of outdoor air with the indoor spaces where Group A Plaintiffs and Group C Decedents worked.

171.   When Group A Plaintiffs and Group C Decedents began working at Building 606, some of them were initially drinking the tap water, and drinking from the drinking fountain, in Building 606.

172.   Water sampling in Building 606 identified and verified elevated levels of an unidentified petroleum product in the hot water system, as well as from the water main supplying the building; identified trihalomethane concentrations in excess of state Maximum Contaminant Levels (MCLs) in both the hot and cold portions of the Building 606 water system; and identified intermittent lead concentrations in excess of State MCLs, in both the hot and cold portions of the Building 606 water system.

173.   Although bottled water was eventually provided to Group A Plaintiffs and Group C Decedents , they at all relevant times brushed their teeth, showered, and washed their hands in the Building 606 water.

174.   Contamination was, at all relevant times, present in the drain piping for Building 606.

175.   Samples collected in the storm water drain to the northwest of Building 606 identified vinyl chloride and Aroclor-1260 at concentrations above levels of concern for human health.

176.   Water samples collected from the Parcel D sewer lines indicated the presence of arsenic, lead, manganese at concentrations above levels of concern to human health.

177.   The drain pipes in and immediately outside Building 606 would frequently overflow, causing Group A Plaintiffs and Group C Decedents to be directly

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

43

FIRST AMENDED COMPLAINT FOR DAMAGES - CASE NO. 3:19-CV-07510-JD

1   exposed to contamination from within old sanitary sewer and storm drain pipes.

2   178.   Sampling of the steam lines in Parcel D indicated the presence of

3   contaminants. Total Petroleum Hydrocarbons (TPH)-gasoline, total oil and grease,

4   and mercury were detected in Parcel D steam lines at concentrations above levels of

5   concern to human health.

6   179.   The landfill near Building 606 was at all times emitting methane gas, to

7   which Group A Plaintiffs and Group C Decedents were exposed.

8   180.   The landfill near Building 606 was at all times emitting chlorine gas

9   from underground cylinders, to which Group A Plaintiffs and Group C Decedents

10   were exposed.

11   **3.    Hazardous Substances Present at the Helipad Property**

12   181.   During the operation of NRDL, the Helipad Property, unlike much of

13   HPNS, was unpaved soil. It was in a location downwind of most of the sandblasting

14   and other radioactive cleanup activities while the NRDL was in operation.

15   182.    The Helipad Property is adjacent to a "Former NRDL Site" on Mahan

16   Street, which was hand drawn on a 1949 map and annotated "Buildings Now

17   Occupied by NRDL." The site is approximately 300 feet north-northwest of Berth 21.

18   It was used for unknown radiological activities.

19   183.   The Helipad Property was at all relevant times contaminated by Cs-137

20   and Ra-226 exceeding release limits.

21   184.   Groundwater from IR-44 and IR-70 flows toward and into the Helipad

22   Property, causing contamination of its soil and groundwater with multiple hazardous

23   substances.

24   185.   The SFPD constructed an approximately 144,000 square-foot paved

25   helicopter takeoff and landing pad. The helicopter conducted approximately two

26   routine flights per day, plus eight to ten additional emergency response flights each

27   month.

28   186.   Effective September 3, 2002, the Helipad started to be used for

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

44

FIRST AMENDED COMPLAINT FOR DAMAGES - CASE NO. 3:19-CV-07510-JD

1    emergency medical aircraft.

2         187.   When helicopters would take off and land at the Helipad Property, their

3    rotors would stir up dust and fling rocks, created increased exposure to Group A

4    Plaintiffs and Group C Decedents.

5              **4.    Hazardous Substances Present Around the Building 606**
              **Property**
6

7         188.   The Building 606 Property was, prior to about March of 2005, included

8    as part of Sub-parcel S-41 within Parcel D.

9         189.   The Building 606 Property was, after about March of 2005, moved into

10   and considered a part of Parcel E.

11        190.   The Building 606 Property is now part of Redevelopment Block MU-2

12   within Parcel E, at the edge of reuse area EOS-4, and at the edge of Parcel G and

13   Parcel D-1. It is involved in IR sites IR-08 and IR-38.

14        191.   EOS-4, where Building 606 is located, is also the site of Building 521,

15   Triple A Sites 6, 7, 12, and 13, former NRDL buildings 506, 509, 510, 510A, 517, and

16   529, which were used for oily liquid waste disposal, incineration of unknown

17   industrial materials (Triple A Site 12), waste pond area (Triple A Site 13) steam

18   generating power plant in Building 521.

19        192.   EOS-4 used to store PCB-containing liquid waste that was dumped

20   along the shoreline, and was the site of a former burn disposal area.

21        193.   EOS-4 also contained IR-73, consisting of removed AST's (former

22   asphalt manufacturing plant, removed AST's, and storage of drums containing

23   unidentified oily liquids.

24        194.   The Building 606 Property is at the epicenter of the cluster of buildings

25   that initially were the NRDL, and which were known to have been highly

26   radioactive, and known to have released radionuclides into the surrounding soil and

27   drains.

28        195.   Building 606 is either on or immediately adjacent to the sites of former

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

1  buildings used by NRDL including the following:

2         a.   An electrical substation (Building 527, IR-40, EOS-4);

3         b.   A radioactive chemistry laboratory (Building 509);

4         c.   A radioactive physics laboratory (Buildings 510 and 510A),

5         d.   A radioactive biomedical facility (Building 517);

6         e.   Radioisotope storage and Cockroft-Walton accelerator (Building

7  529);

8         f.   Radioactive biomedical laboratory (Building 507);

9         g.   Radioactive health physics office (Building 508);

10      196.   Other nearby buildings include Building 707, which had a pole-mounted

11  transformer and was used by the NRDL for animal research, Building 708, which

12  was a Biomedical facility. (IR-39), Building 406, which was the site of a groundwater

13  plume involving trichloroethene (TCE), 1,4-DCB, carbon tetrachloride, 1,2-DCE,

14  PCE, and vinyl chloride, Building 413, which showed elevated chemical

15  concentrations of metals, SVOCs, and TPH, a landfill containing known benzene,

16  chlorine, radium dials, and methane.

17      197.   During the time that Group A Plaintiffs and Group C Decedents worked

18  at HPNS, the Navy implemented several Time Critical Removal Actions (TCRAs) to

19  remove Polychlorinated Biphenyl (PCB) spills in the immediate vicinity of Building

20  606. Along the western excavation sidewall, one sample had a PCB concentration of

21  approximately 12,000 milligram per kilogram (mg/kg) and another sample had a

22  TPH concentration of 34,120 mg/kg.

23      198.   The steam line system (IR-45) which crosses through MU-2 and EOS-4

24  was used by Triple A for transporting waste oil from Berth 29 in Parcel D and Dry

25  Dock 4 in Parcel C to Building 521 and former AST S-505.

26      199.   The fuel distribution lines (IR-47) were used by Triple A for waste oil

27  transportation from Berth 29 in Parcel D and Dry Dock 4 in Parcel C to Building 521

28  and former AST S-505, and to the former oil reclamation ponds.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

46

FIRST AMENDED COMPLAINT FOR DAMAGES - CASE NO. 3:19-CV-07510-JD

200.    The soil in the immediate vicinity of and directly in and on the Subject leased property was at all relevant times contaminated by numerous hazardous substances, some of which are still unknown. These substances include but are not limited to arsenic, chloroform, beryllium, benzene, hexavalent chromium, trichloroethylene, vinyl chloride, tetrachloroethylene, benzo(a)anthracene, benzo(a)pyrene, benzo(b)fluoranthene, 4,4'-DDE, 4,4'-DDD, Aroclor-1260, Aroclor-1254, petroleum hydrocarbons, 3,3'-dichlorosbenzidine, 4-nitrophenol, 4, aldrin, alpha-BHC, antimony, benzo(k)fluoranthene, bis(2-ethylhexyl)phthalate, cadmium, carbazole, dibenz(a, h)anthracene, dieldrin, gamma-BHC, heptachlor epoxide, indeno(1,2,3-cd)pyrene, n-nitroso-di-n-propylamine, n-nitrosodiphenylamine, naphthalene, pentachlorophenol, thallium, vanadium, zinc, copper, iron, lead, manganese, mercury, and xylene, PCB, TPH, cesium-137, radium-226, and strontium-90, as well as numerous other radionuclides of concern.

201.    In 2013, the Navy, despite its reliance on Tetra Tech's fraudulent understatement of true radiation levels and true risk, nevertheless acknowledged that there was an elevated risk. It specifically acknowledged the following (understated) risks:

a.    Even using Tetra Tech's fraudulently understated test results, and even using a "recreational" scenario that assumed people would be on the land no more than 1-2 hours per day, 2 days per week, for 100 days, the recreational radiological cancer risk estimate for EOS-4 was 7 in 1,000 (meaning that there is a probability that 7 in 1,000 people using the land for such light recreational purposes would get cancer as a result of this exposure), and for MU-2, it was 9 in 10,000.[1]

b.    Using the same assumptions, the pre-cleanup residential cancer risk from breathing indoor air from shallow groundwater in MU-2 was estimated as 1 in 1,000.

_____

[1] For comparison, the US EPA considers a cancer risk of 1 in 1 million to be the maximum permissible cancer risk level for a resident.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

1          c.      Using the same assumptions, the pre-cleanup residential cancer

2 risk from showering with deep groundwater in MU-2 was estimated as 4 in 10,000.

3          d.      Even using Tetra Tech's fraudulently understated test results,

4 and even using a "recreational" scenario, the non-radiological chemical cancer risk for

5 MU-2 was 3 in 1,000, and for EOS-4 was 3 in 10,000.

6          e.      Even using the understated findings, the pre-cleanup recreational

7 hazard index (for non-cancer disease) was 54 for MU-2 (i.e., 54 times the maximum

8 permissible hazard level of 1) and 9.6 for EOS-4 (i.e., 9.6 times the maximum

9 permissible hazard level of 1).

10     202.   On or about August 16, 2000, a 14-acre landfill near Building 606

11 ignited and burned for at least six hours. Several areas of landfill continued to

12 smolder, creating smoke, for at least one month. Group A Plaintiffs and Group C

13 Decedents, and each of them, were exposed to this smoke. On information and belief,

14 the landfill fire caused the release of underground vapors including methane gas,

15 arsenic, chloroform, trichloroethylene, tetrachloroethylene, benzene, and vinyl

16 chloride, which Group A Plaintiffs and Group C Decedents inhaled and which caused

17 them harm.

18     203.   During remediation activities, the levels of airborne particulate matter

19 (dust) became so severe that Group A Plaintiffs and Group C Decedents complained

20 regarding dust levels, and were awarded free car washes for their vehicles. However,

21 Tetra Tech continued to reassure Plaintiffs that the dust, which Plaintiffs carried

22 home on their personal vehicles and clothing, was non-hazardous and did not present

23 any health risk. This was untrue, and the particulate matter that Group A Plaintiffs

24 and Group C Decedents inadvertently inhaled, ingested, and dermally contacted was

25 hazardous and caused them injury.

26     204.   During the time that Group A Plaintiffs and Group C Decedents ,

27 worked at Building 606, the majority of them developed acute symptoms, which

28 predominantly included rashes and other skin conditions, adult-onset asthma, other

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

48

FIRST AMENDED COMPLAINT FOR DAMAGES - CASE NO. 3:19-CV-07510-JD

1   respiratory complaints, headaches, and fatigue. At the time, based on Tetra Tech's

2   misrepresentations regarding the levels of known and suspected contamination,

3   Group A Plaintiffs and Group C Decedents were reassured that their symptoms could

4   not possibly be a result of any hazardous exposure at HPNS.

5        **I.**     **Concealment and Delayed Discovery**

6        205.   As a result of Tetra Tech's fraud, concealment, and negligent

7   misrepresentations, Plaintiffs were kept ignorant and unaware of Tetra Tech's

8   wrongdoing until at least July 2018 or later. Their discoveries in this regard are

9   ongoing.

10        206.   As a result of Tetra Tech's fraud, concealment, and negligent

11   misrepresentations, Group A Plaintiffs and Group C Decedents Plaintiffs were kept

12   ignorant and unaware of their own exposure to hazardous materials until at least

13   July 2018 or later. Their discoveries in this regard are ongoing.

14        207.   As a result of Tetra Tech's fraud, concealment, and negligent

15   misrepresentations, Plaintiffs were kept ignorant the true causation of their

16   diseases, injuries and conditions until at least July 2018 or later. Their discoveries in

17   this regard are ongoing.

18        **FIRST CAUSE OF ACTION**

19        **(Negligent Undertaking, Negligent Misrepresentation)**

20        208.   Plaintiffs repeat and re-allege the preceding paragraphs as if fully set

21   forth herein.

22        **Negligent Undertaking to Investigate and Provide Notice of**

23   **Hazardous Substances in 1996**

24        209.   PRC undertook to and did prepare Environmental Baseline Surveys and

25   Findings of Suitability to Lease for the express purpose of providing the legally

26   required lease notifications to the City in connection with the lease of the Subject

27   leased property.

28        210.   PRC undertook to review all available information regarding the Subject

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

leased property, survey the condition of the Subject leased property, determine the nature, magnitude, and extent of any contamination of the Subject leased property, and provide notice to the City on behalf of the Navy as required under § 120(h) of CERCLA of the type, quantity, and time frame of any storage, release, or disposal of a hazardous substance on the property.

211. PRC undertook to identify, obtain, and review all data, documents, and records relevant to determining the potential for present and past contamination of the Subject leased property, including a review of historical records, and other available documents to ascertain prior uses of the Subject leased property that may have involved hazardous substances or otherwise contaminated the Subject leased property.

212. PRC undertook to notify the City (and, through the City, Group A Plaintiffs and Group C Decedents) of any known release of hazardous substances at the Subject leased property.

213. PRC undertook to provide an accurate and thorough review of the past use and current condition of the Subject Leased Property and the HPNS Base, as of 1996, and to accurately and thoroughly communicate that past use and current condition to the City.

214. PRC's services, in preparing the Subject Lease, the Building 606 EBS, and the Building 606 FOSL, were rendered in performing a duty that the Navy owed to third party transferees and tenants at HPNS, including the City and Group A Plaintiffs.

215. PRC voluntarily, and for a charge, rendered investigation services for the Navy, and should have realized that these services were of a kind that were needed for the protection of the City and its employees, including Group A Plaintiffs and Group C Decedents, as they prepared to receive and occupy the Subject leased property.

216. In investing the Subject leased property, and publishing its disclosures

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

FIRST AMENDED COMPLAINT FOR DAMAGES - CASE NO. 3:19-CV-07510-JD

1  regarding the Subject leased property for the benefit of the Navy and the City in and

2  about 1996, PRC failed to exercise reasonable care.

3       217.   PRC's failure to exercise reasonable care in investigating of the Subject

4  leased property, and in publishing its disclosures regarding the Subject leased

5  property, added to the risk of harm to Plaintiffs, and each of them.

6       218.   As a direct and legal result of PRC's failure to exercise reasonable care

7  in investigating the Subject leased property, and in publishing its disclosures

8  regarding the Subject leased property, Plaintiffs, and each of them, sustained

9  damages as set forth hereinabove.

10      **Negligent Misrepresentations in 1996**

11      219.   PRC negligently misrepresented to the Navy and City (and, through the

12 Navy and City, to Group A Plaintiffs and Group C Decedents) the history of

13 hazardous substances at HPNS, the history of hazardous substances at the Subject

14 leased property, and the presence of and potential for exposure to hazardous

15 substances at the Subject leased property. These misrepresentations include but are

16 not limited to the following misrepresentations to the City in the Building 606 EBS:

17      a.   [T]here are no known health risks associated with the use of

18 Building 606 for office administration and staging by the SFPD.

19      b.   Former Building 503, which was on the Building 606 site, "did not

20 have uses consistent with the storage or use of hazardous materials."

21      c.   During the NRDL years, HPA was used for "limited radiological

22 operations."

23      d.   As part of the disestablishment of NRDL, all sites were surveyed

24 for radiological contamination and decontaminated if necessary.

25      e.   PRC "placed building 606 in category 4, since remedial actions

26 are complete, and the building was recently leased by the movie industry."

27      f.   The condition of all the spaces [in Building 606] is excellent with

28 no signs of the use, storage, or spillage of hazardous materials or petroleum

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

FIRST AMENDED COMPLAINT FOR DAMAGES - CASE NO. 3:19-CV-07510-JD

1  products."

2      g.      "There are no potential interior sources" of hazardous exposure in

3  Building 606.

4      h.      Known contamination of Parcel D steam lines with TPH-gasoline,

5  oil, grease, and mercury is not of concern at Building 606 because "[t[[here are no

6  steam lines indicated in or around Building 606."

7      220.   PRC's representations to the City were not true.

8      221.   PRC had no reasonable grounds for believing these representations

9  were true when it made them.

10     222.   When PRC made these representations, it intended for the City to rely

11  on them in exposing its employees to the Subject leased property, and surrounding

12  property and materials.

13     223.   The City, in exposing its employees to the Subject leased property and

14  surrounding property and materials, reasonably relied on PRC's representations.

15     224.   As a legal result of their exposure at HPNS, Group A Plaintiffs, and

16  each of them, were harmed in that they sustained acute physical injuries at or near

17  the time of their exposure (including, for example, rashes and other skin conditions,

18  adult onset asthma, other respiratory complaints, fatigue, and headaches).

19     225.   As a further legal result of their exposure at HPNS, Group A Plaintiffs,

20  and each of them, were also harmed in that they suffer from past and future chronic

21  illnesses and diseases both diagnosed and undiagnosed, and known and presently

22  unknown (including, for example, immune compromise, cellular dysfunction, lung

23  cancer, melanoma, basal cell carcinoma, squamous cell carcinoma, thyroid cancer,

24  lymphoma, reproductive cancer, thyroid disease, heart disease, blood disorders, and

25  other chronic medical conditions related to environmental exposure).

26     226.   As a further legal result of their exposure at HPNS, Group A Plaintiffs,

27  and each of them, were also harmed in that they are at an elevated risk of developing

28  future illnesses and diseases (including, for example, immune compromise, cellular

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

52

FIRST AMENDED COMPLAINT FOR DAMAGES - CASE NO. 3:19-CV-07510-JD

1 dysfunction, lung cancer, melanoma, basal cell carcinoma, squamous cell carcinoma,

2 thyroid cancer, lymphoma, reproductive cancer, thyroid disease, heart disease, blood

3 disorders, and other chronic medical conditions related to environmental exposure).

4     227.   As a further legal result of their exposure at HPNS, Group A Plaintiffs,

5 and each of them, have suffered past and future pain and suffering, including mental

6 suffering, anxiety, and emotional distress, loss of enjoyment of life, and physical

7 impairment.

8     228.   As a further legal result of their exposure at HPNS, Group A Plaintiffs,

9 and each of them, have incurred past and future expenses for medical monitoring and

10 diagnostic services; past and future expenses for medical care and related treatment;

11 and past and future wage loss and loss of earning capacity.

12     229.   The City's reliance on PRC's misrepresentations was a substantial

13 factor in causing Plaintiffs' harm.

14     230.   In its representations to the City regarding the hazardous substances

15 released at the Subject leased property, and surrounding property, PRC negligently

16 omitted, concealed, and failed to warn of those hazardous substances and associated

17 risks that were known or reasonably knowable at the time.

18     231.   PRC's negligent omissions, concealment, and failure to warn the City

19 (and, through the City, Group A Plaintiffs and Group C Decedents) of the prior

20 release of hazardous substances at the Subject leased property was a substantial

21 factor in causing Plaintiffs' harm.

22     232.   As a direct and legal result of PRC's negligent omissions, concealment,

23 and failure to warn the City (and, through the City, Group A Plaintiffs), Plaintiffs,

24 and each of them, sustained damages as set forth hereinabove.

25     **Negligent, Reckless, and Willfully Dangerous Cleanup**

26     233.   From 2003 through 2014, Tetra Tech was the Navy contractor with

27 overall control of the HPNS base and of remediation efforts and radiological cleanup

28 throughout HPNS.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

53

FIRST AMENDED COMPLAINT FOR DAMAGES - CASE NO. 3:19-CV-07510-JD

234.   From 2003 through 2014, pursuant to the Remediation Contracts, Tetra Tech was responsible for the safety of all individuals in the vicinity of the work site areas at HPNS, which at all relevant times included Group A Plaintiffs and Group C Decedents, and each of them.

235.   Pursuant to the Remediation Contracts, Tetra Tech was required to prepare a Health & Safety Plan to protect project personnel and the general public from exposure to hazardous substances.

236.   Pursuant to the Remediation Contracts, Tetra Tech was required to communicate with third parties, including the City SFPD and Group A Plaintiffs and Group C Decedents, regarding risks affecting them related to the remediation at HPNS.

237.   From about 2003 to about 2014, Tetra Tech negligently performed its Remediation Contracts at HPNS, causing Group A Plaintiffs and Group C Decedentsto be exposed to numerous hazardous substances, including but not limited to ionizing radiation.

238.   From about 2003 to about 2014, Tetra Tech, through its managing agents, including but not limited to William Dougherty, Dennis McWade, Justin Hubbard, and Stephen Rolphe,  recklessly, fraudulently, maliciously, and with knowing disregard of the rights and safety of Group A Plaintiffs and Group C Decedents, and each of them, performed work pursuant to its Remediation Contracts, concealing the true extent of hazardous contamination at HPNS, and as a result processing contaminated materials as if they were not contaminated, and causing Group A Plaintiffs and Group C Decedents to be exposed to numerous hazardous substances, including but not limited to ionizing radiation.

239.   As a direct and legal result of PRC's negligent cleanup, Plaintiffs, and each of them, sustained damages as set forth hereinabove.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

54

FIRST AMENDED COMPLAINT FOR DAMAGES - CASE NO. 3:19-CV-07510-JD

1

## **SECOND CAUSE OF ACTION**

2

### **(Public Nuisance)**

3        240.   Plaintiffs repeat and re-allege the preceding paragraphs as if fully set

4    forth herein.

5        241.   Tetra Tech, by its representations to the Navy, the City, and Group A

6    Plaintiffs and Group C Decedents, and by its remediation activity, increased the

7    proximity of hazardous substances, including but not limited to radiation and

8    hazardous dust, to the Group A Plaintiffs and Group C Decedents.

9        242.   Tetra Tech thereby created a condition that was harmful to health, and

10   interfered with Plaintiffs' comfortable enjoyment of life and property.

11       243.   The condition Tetra Tech created affected a substantial number of

12   people at the same time.

13       244.   An ordinary person would be reasonably annoyed or disturbed by the

14   condition Tetra Tech created.

15       245.   The seriousness of the harm Tetra Tech created outweighs the social

16   utility of its conduct.

17       246.   Group A Plaintiffs, by virtue of their presence at HPNS in the epicenter

18   of the remediation activities, suffered harm that was different from the type of harm

19   suffered by the general public.

20       247.   Tetra Tech's conduct was a substantial factor in causing Plaintiffs'

21   harm.

22       248.   As a direct and legal result of PRC's negligent cleanup, Plaintiffs, and

23   each of them, sustained damages as set forth hereinabove.

24   \\\

25   \\\

26   \\\

27   \\\

28   \\\

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

55

FIRST AMENDED COMPLAINT FOR DAMAGES - CASE NO. 3:19-CV-07510-JD

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

## THIRD CAUSE OF ACTION

**(Racketeer Influenced and Corrupt Organization Act; 18 U.S.C.A. § 1961 *et seq.*)**

### COUNT ONE:

**Acquisition and Maintenance of an Interest in and Control of an Enterprise Engaged in a Pattern of Racketeering Activity: 18 U.S.C. §§ 1961(5), 1962(b)**

249.    Plaintiffs repeat and re-allege the preceding paragraphs as if fully set forth herein.

250.    At all times and places alleged herein, the Defendants constituted an enterprise as defined by 18 U.S.C. § 1961(4).

251.    At the times and places alleged herein, this RICO enterprise consisted of the Defendants, individuals, and business entities who were associated in fact and who did engage in, and whose activities did affect, interstate and foreign commerce, all in violation of 18 U.S.C. §§ 1961(4), (5), (9), and 1962(b).

252.    During the eleven calendar years preceding and including 2014, Defendants did cooperate jointly and severally in the commission of two or more of the RICO predicate acts that are itemized in the RICO statute at 18 U.S.C. §§ 1961(1)(A) and (B), namely mail and wire fraud, and did so in violation of the RICO statute at 18 U.S.C. § 1962(b).

253.    Defendants have conducted and participated in the fraudulent activities described herein through a pattern of racketeering activity that includes acts indictable under 18 U.S.C. §§ 1341 and 1343 (mail and wire fraud).

254.    In implementing their fraudulent scheme, Defendants were aware that the Group A Plaintiffs and Group C Decedents were relying on the honesty of Defendants in representing the safety of the HPNS.

255.    At all the times and places alleged herein, the Defendants used the fraudulent scheme described herein to acquire and/or maintain, directly or indirectly, an interest in or control of a RICO enterprise.

256.    As a direct and legal result of the Defendants' conduct described herein,

56

1 | Plaintiffs sustained damages as set forth herein.

2 | **COUNT TWO:**

3 | **Conduct and Participation in a RICO Enterprise through a Pattern of
4 | Racketeering Activity: 18 U.S.C. §§ 1961(5), 1962(c)**

5 | 257.   Plaintiffs repeat and re-allege the preceding paragraphs as if fully set

6 | forth herein.

7 | 258.   At all times and places alleged herein, the Defendants constituted an

8 | enterprise as defined by 18 U.S.C. § 1961(4).

9 | 259.   At the times and places alleged herein, this RICO enterprise consisted

10 | of the Defendants, individuals and business entities who were associated in fact and

11 | who did engage in, and whose activities did affect, interstate and foreign commerce,

12 | all in violation of 18 U.S.C. §§ 1961(4), (5), (9), and 1962(b).

13 | 260.   During the eleven calendar years preceding and including 2014,

14 | Defendants did cooperate jointly and severally in the commission of two or more of

15 | the RICO predicate acts that are itemized in the RICO statute at 18 U.S.C. §§

16 | 1961(1)(A) and (B), namely wire fraud, and did so in violation of the RICO statute at

17 | 18 U.S.C. § 1962(c).

18 | 261.   At the times and places alleged in herein, all Defendants did themselves

19 | constitute the RICO enterprise, and therefore knowingly and willfully associated

20 | with a RICO enterprise in violation of 18 U.S.C. § 1962(c).

21 | 262.   At the times and places alleged herein, all Defendants knowingly and

22 | willfully conducted and/or participated, either directly or indirectly, in the conduct of

23 | the affairs of said RICO enterprise through a pattern of racketeering activity, all in

24 | violation of 18 U.S.C. §§ 1961(4), (5), (9), and 1962(c).

25 | 263.   Defendants have knowingly and willfully conducted and participated in

26 | the fraudulent activities described herein through a pattern of racketeering activity

27 | that includes acts indictable under 18 U.S.C. §§ 1341 and 1343 (mail and wire fraud).

28 | 264.    As a direct and legal result of the Defendants' conduct described herein,

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

1  Plaintiffs sustained damages as set forth above.

2  ### COUNT THREE:

3  ### Conspiracy to Engage in a Pattern of Racketeering Activity: 18 U.S.C. §§ 1961(5), 1962(d)

4

5  265.   Plaintiffs repeat and re-allege the preceding paragraphs as if fully set

6  forth herein.

7  266.   At all times and places alleged herein, the Defendants constituted an

8  enterprise as defined by 18 U.S.C. § 1961(4).

9  267.   At the times and places alleged herein, this RICO enterprise consisted

10  of the Defendants, individuals and business entities who were associated in fact and

11  who did engage in, and whose activities did affect, interstate and foreign commerce,

12  all in violation of 18 U.S.C. §§ 1961(4), (5), (9), and 1962(b).

13  268.   During the eleven calendar years preceding and including 2014,

14  Defendants did cooperate jointly and severally in the commission of two or more of

15  the RICO predicate acts that are itemized in the RICO statute at 18 U.S.C. §§

16  1961(1)(A) and (B), namely wire fraud, and did so in violation of the RICO statute at

17  18 U.S.C. § 1962(d).

18  269.   Defendants have knowingly and willfully conducted and participated in

19  the fraudulent activities described herein through a pattern of racketeering activity

20  that includes acts indictable under 18 U.S.C. §§ 1341 and 1343 (mail and wire fraud).

21  270.   In the operation of the RICO enterprise, the Defendants, and each of

22  them, did come to a mutual understanding for the purpose of accomplishing or

23  attempting to accomplish the fraudulent activity described herein, in violation of 18

24  U.S.C. § 1962(d).

25  271.   The Defendants, each of them associated with the RICO enterprise

26  through their knowledge of and participation in the fraudulent scheme described

27  herein, engaged in activities that affected interstate and foreign commerce, and

28  conducted the affairs of the RICO enterprise through a pattern of racketeering

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

58

FIRST AMENDED COMPLAINT FOR DAMAGES - CASE NO. 3:19-CV-07510-JD

1  activity.

2      272.   The Defendants each knowingly and willfully became members of a

3  conspiracy by participating in and agreeing to participate in, both directly and

4  indirectly, the fraudulent scheme described herein,

5      273.   The actions taken by each Defendant described herein constitute overt

6  acts knowingly and willfully taken in furtherance of the objects and purposes of the

7  fraudulent scheme.

8      274.   As a direct and legal result of the Defendants' conduct described herein,

9  Plaintiffs sustained damages as set forth above.

10              **FOURTH CAUSE OF ACTION**

11                  **(Loss of Consortium)**

12          **(By Group B Plaintiffs Against All Defendants)**

13      275.   Plaintiffs repeat and re-allege the preceding paragraphs as if fully set

14  forth herein.

15      276.   Each Group B Plaintiff was and is at all relevant times the lawful

16  spouse or domestic partner of a Group A Plaintiff, as set forth in Exhibit B, which is

17  incorporated herein by this reference.

18      277.   Each Group B Plaintiff was harmed by the injury to his or her spouse or

19  domestic partner.

20      278.   As a direct and legal result of the conduct of Defendants, and each of

21  them, as set forth hereinabove, and of the injuries to the Group A Plaintiffs, each

22  Group B Plaintiff suffered a loss of consortium, including but not limited to the loss

23  of his or her spouse or domestic partner's companionship, comfort, care, assistance,

24  protection, affection, society, and support.

25              **FIFTH CAUSE OF ACTION**

26                  **(Wrongful Death)**

27          **(By Group C Plaintiffs Against All Defendants)**

28      279.   Plaintiffs repeat and re-allege the preceding paragraphs as if fully set

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

59

FIRST AMENDED COMPLAINT FOR DAMAGES - CASE NO. 3:19-CV-07510-JD

1  forth herein.

2      280.   This cause of action is brought on behalf of Group C Plaintiffs.

3      281.   By reason of the premises, and as a direct and legal result of

4  Defendants' act and omissions as set forth above, Group C decedents, whose

5  identities are stated in Exhibit C, were exposed at HPNS to hazardous substances

6  and radiation, which were a substantial factor in causing each of them to suffer from

7  fatal diseases.

8      282.   Group C Plaintiffs are those surviving family members of Group C

9  decedents, who have standing to bring a wrongful death action.

10     283.   As a direct and legal result of Defendants' acts and omissions as set

11 forth above, Group C Plaintiffs and each of them, have been deprived of the

12 companionship, comfort, care, assistance, protection, affection, society, and support of

13 their loved ones, as set forth in Exhibit C.

14     284.   As a further direct and legal result of the Defendants' actions and/or

15 omissions, Group C Plaintiffs, and each of them, have incurred medical, funeral and

16 burial expenses in an amount to be shown according to proof at trial.

17     285.   As a further direct and legal result of Defendants' actions and/or

18 omissions, and/or each of them, Group C Plaintiffs suffered economic losses,

19 including but not limited to the loss of financial support, and/or the loss of household

20 services in an amount according to proof of trial.

21                    **SIXTH CAUSE OF ACTION**

22     **(Negligent Infliction of Emotional Distress—Fear of Cancer)**

23                    **(Against all Defendants)**

24     286.   Plaintiffs repeat and re-allege the preceding paragraphs as if fully set

25 forth herein.

26     287.   As the direct and legal result of Tetra Tech's negligence, carelessness,

27 and other culpable acts and/or omissions, Plaintiffs were exposed to carcinogenic and

28 additional toxic substances at HPNS from 1996 to the present.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

60

FIRST AMENDED COMPLAINT FOR DAMAGES - CASE NO. 3:19-CV-07510-JD

288.   Plaintiffs were kept ignorant of their exposure to these carcinogenic and additional toxic substances until at least July 2018, due to Tetra Tech's negligence and carelessness.

289.   Tetra Tech, by and through its agents and employees, acted with malice and oppression in that its conduct was despicable and carried out with a willful or conscious disregard of Plaintiffs' safety, right to health, and overall well-being when it exposed Plaintiffs to the radioactive and otherwise toxic substances, knowing the grave health risks to Plaintiffs, but misrepresenting them and increasing them.

290.   As a direct and legal result of Tetra Tech's negligence, and carelessness, Plaintiffs have suffered serious emotional distress from a fear that they will develop various forms of cancer as a result of their exposure to carcinogenic substances at HPNS. Plaintiffs' serious emotional distress includes suffering, anguish, fright, horror, nervousness, grief, anxiety, worry, and shock.

291.   Plaintiffs, as a result of Tetra Tech's conduct, and upon learning of their increased risk of cancer, suffered emotional distress so serious that an ordinary person would be unable to cope with it.

292.   Reliable medical or scientific opinion can and will confirm that Plaintiffs' risks of developing cancer and additional maladies were significantly increased by the exposure and has resulted in an actual risk of cancer that is significant in nature.

293.   Tetra Tech's negligence, carelessness, and other culpable actions and/or omissions were a substantial factor in causing Plaintiffs' serious emotional distress upon learning of their heightened risks of cancer due to exposure to known radiation at HPNS.

294.   Tetra Tech's negligence, carelessness, and other culpable acts and/or omissions constitute despicable conduct, as those actions are looked down upon and despised by reasonable people.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

## SEVENTH CAUSE OF ACTION

### (Intentional Infliction of Emotional Distress)

### (Against all Defendants)

295.   Plaintiffs repeat and re-allege the preceding paragraphs as if fully set forth herein.

296.   Tetra Tech, at all relevant times, intentionally gave false reports regarding the true level of radioactivity at HPNS, and it moved soil and other materials both within the HPNS base, and off base, making it difficult or even impossible to ever ascertain the true levels of radioactivity to which Plaintiffs were exposed.

297.   Tetra Tech knew that Plaintiffs were present at HPNS when this conduct occurred, and Tetra Tech knew that Plaintiffs would probably suffer emotional distress as a result of Tetra Tech's conduct, including but not limited to its spoliation of evidence regarding the true level of radioactivity.

298.   Tetra Tech's conduct described herein was a substantial factor in causing Plaintiffs, and each of them, to suffer severe emotional distress.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, and each of them, demand and pray that judgment be entered in their favor against Defendants, and each of them, as follows:

A.   For noneconomic damages according to proof at trial;

B   For economic damages according to proof at trial;

C.   For costs of suit and attorneys' fees to the fullest extent permitted by law;

D.   For pre-judgment and post-judgment interest according to law;

E.   For punitive and exemplary damages in an amount that is sufficient to punish Defendants and deter them and others from engaging in similar conduct in the future;

F.   For treble damages according to proof at trial under the RICO statute;

LAW OFFICES OF
**WALKUP, MELODIA, KELLY
& SCHOENBERGER**
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

62

FIRST AMENDED COMPLAINT FOR DAMAGES - CASE NO. 3:19-CV-07510-JD

1    G.    For such other and further relief as the Court may deem proper.

2

3    Dated:  February 28, 2020          WALKUP, MELODIA, KELLY & SCHOENBERGER

4

5                                       By:      /s/ *Khaldoun A. Baghdadi*

6                                                KHALDOUN A. BAGHDADI
                                                 SARA M. PETERS
7                                                JADE SMITH-WILLIAMS
                                                 Attorneys for PLAINTIFFS
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

63

FIRST AMENDED COMPLAINT FOR DAMAGES - CASE NO. 3:19-CV-07510-JD

1

**DEMAND FOR JURY TRIAL**

2

Plaintiffs hereby demand a jury trial.

3

4

Dated:  February 28, 2020            WALKUP, MELODIA, KELLY & SCHOENBERGER

5

6

7                                     By:  _____/s/ *Khaldoun A. Baghdadi*_____
                                          KHALDOUN A. BAGHDADI
8                                         SARA M. PETERS
                                          JADE SMITH-WILLIAMS
9                                         Attorneys for PLAINTIFFS

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

FIRST AMENDED COMPLAINT FOR DAMAGES - CASE NO. 3:19-CV-07510-JD